## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

STEPHANIE GOETTL VANDER PAS,       File No.: _____

              Plaintiff,

   v.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

              Defendant.

## COMPLAINT

NOW COMES the above-named Plaintiff, by her attorneys, Godfrey, Leibsle, Blackbourn & Howarth, S.C., and as and for a cause of action against the above-named Defendant, alleges and shows to the Court as follows:

### PARTIES

1.      Plaintiff, Stephanie Goettl Vander Pas ("Stephanie"), is an adult residing at 720 South Marquette Street, Unit 405, Racine, Wisconsin 53403.

2.      Defendant, Board of Regents of the University of Wisconsin System ("Board of Regents"), upon information and belief, is a body corporate existing under Wis. Stat. § 36.07(1), and an agency and board of the state government of Wisconsin. The Board of Regents has its principal office at 1860 Van Hise Hall, 1220 Linden Drive, Madison, Wisconsin 53706.

3.      The University of Wisconsin Whitewater ("UW-Whitewater"), upon information and belief, is a public university located in Whitewater, Wisconsin, with a mailing address of 800 West Main Street, Whitewater, Wisconsin, 53191.  UW-Whitewater is part of the University of Wisconsin System.

4. UW-Whitewater, on its website, touts itself as a "safe campus where you'll find plenty of room to learn and grow."

5. The Board of Regents, upon information and belief, is responsible for establishing policies and rules for governing the University of Wisconsin System, including UW-Whitewater. The Board of Regents appoints the chancellors of the 13 universities that presently comprise the University of Wisconsin System, including UW-Whitewater.

6. Alan Hill a/k/a Pete Hill ("Hill"), upon information and belief, is an adult who, at all times relevant to this Complaint, was a resident of the City of Whitewater, Wisconsin, and the spouse of former UW-Whitewater Chancellor, Beverly Kopper ("Chancellor Kopper").

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as the events giving rise to the claims in this action occurred in this District.

## BACKGROUND FACTS

### Stephanie's Undergraduate Experiences With Hill

9. In fall 2009, Stephanie enrolled as a freshman at UW-Whitewater.

10. During her undergraduate studies, Stephanie excelled academically and was actively involved in extra-curricular activities.

11. As an undergrad, Stephanie was appointed to UW-Whitewater Student Government ("WSG") as a senator.

12. Through WSG, Stephanie participated in UW-Whitewater's search for a new provost and vice chancellor for academic affairs. In fall 2009, Stephanie met with potential

candidates for the position, which included Chancellor Kopper. At that time, Chancellor Kopper was associate provost for academic affairs at the University of Northern Iowa.

13.    On December 2, 2009, Chancellor Kopper was hired as UW-Whitewater's provost and vice chancellor for academic affairs.

14.    On November 15, 2011, while a junior at UW-Whitewater, Stephanie was appointed to the City of Whitewater Common Council ("City Council").

15.    As a representative of WSG and the City Council, and through involvement in an alumni mentor program, Stephanie attended many UW-Whitewater sponsored events and gatherings.

16.    Through her attendance at these events and gatherings, Stephanie became acquainted with Chancellor Kopper.

17.    In December 2012, Stephanie attended a holiday party at then Chancellor Telfer's home.

18.    Hill, 65 years old at that time, had a reputation throughout the UW-Whitewater community as a man who frequently initiated unwanted physical contact with UW-Whitewater female students and employees.

19.    During the party at Chancellor Telfer's house, Hill approached Stephanie while she was alone. Hill commented on Stephanie's appearance, stating that she was a "very pretty girl."

20.    Throughout the remainder of her undergraduate studies, Stephanie had unavoidable contact with Hill at UW-Whitewater sponsored gatherings and events.

21.     During these unavoidable contacts, Hill would make sexually harassing comments about Stephanie's appearance, including, "You are a beautiful woman," and "That dress fits you just right."

22.     Hill would also make inappropriate comments and ask inappropriate questions about Stephanie's personal relationships, including, "I don't know why you are with him," and "There are other guys who would like to have a chance with you."

23.     Hill would also initiate unwanted full-frontal hugs without Stephanie's consent.

24.     In spring 2013, Stephanie graduated from UW-Whitewater, but she remained active in UW-Whitewater sponsored gatherings and events in her role as a member of the City Council and through her employment with a real estate management company that served many UW-Whitewater students.

## Beverly Kopper Appointed as Chancellor

25.     In November 2014, Chancellor Telfer announced his retirement, effective June 20, 2015.

26.     On May 26, 2015, UW System President Ray Cross ("Cross") announced Chancellor Kopper as the 16th Chancellor of UW-Whitewater.

27.     Via letter dated May 27, 2015, Cross offered Hill "a formal appointment as an unpaid member of the academic staff with the title of Associate of the Chancellor . . . ."

28.     Cross' letter stated, "Your appointment as an Associate of the Chancellor recognizes that your volunteer public service responsibilities on behalf of the University of Wisconsin-Whitewater may require the use of campus facilities, equipment, and vehicles to discharge appropriately the duties associated with your status."

4

29.     Hill accepted the position, effective July 1, 2015.

30.     Through his position as "Associate of the Chancellor," Hill participated in UW-Whitewater sponsored fundraising, alumni, and athletic functions as a *de facto* representative of UW-Whitewater, with UW-Whitewater's knowledge and consent.

## UW-Whitewater's History of Deliberate
## Indifference to Sexual Harassment and Assault

31.     Through its unreasonable and deliberate indifference, both before and after the appointment of Hill as "Associate of the Chancellor," UW-Whitewater created an environment in which rampant instances of sexual harassment and assaultive behavior were allowed to occur unchecked.

32.     For example, in January 2013, Timothy Fader ("Fader"), then UW-Whitewater's head wrestling coach, reported an alleged sexual assault to the then Athletic Director, Amy Edmonds ("Edmonds").

33.     Edmonds apparently failed to make or keep any record of Fader's report.

34.     In April 2014, Fader reported another alleged sexual assault involving one of Fader's wrestling recruits. Fader made the report directly to City of Whitewater police.

35.     After UW-Whitewater officials learned that Fader had reported the sexual assault directly to police, Fader was suspended from his position at UW-Whitewater.

36.     Shortly thereafter, Chancellor Telfer requested Fader's letter of resignation.

37.     Fader filed a federal lawsuit against Telfer and Edmonds, in which Fader alleged he was wrongfully terminated for reporting the alleged sexual assault to police rather than to UW-Whitewater.

38.     Fader accused Chancellor Telfer and Edmonds of retaliating against him because his report to the police made it harder for UW-Whitewater to "cover up" the 2014 sexual assault report.

39.     Fader also alleged UW-Whitewater gave Fader bad reviews, which prevented Fader from obtaining new employment.

40.     The firing of Fader, after he reported the alleged sexual assault, was highly publicized by the media.

41.     Fader appeared on ESPN's nationally-broadcast program *Outside the Lines* to discuss his termination from UW-Whitewater and the allegations of his lawsuit.

42.     The firing of Fader and the resulting publicity made it abundantly clear to UW-Whitewater employees and students, and specifically Stephanie, that those who report instances of sexual assault would themselves be punished.

43.     UW-Whitewater has been widely criticized, locally and nationally, for its repeated failures to adequately respond to allegations of sexual harassment and assault.

44.     Not only has UW-Whitewater received harsh criticism from local and national media, but it has also been named in numerous Title IX Complaints with the Civil Rights Division of the U.S. Department of Education in the past 10 years.

45.     On May 1, 2014, in an unprecedented move, the U.S. Department of Education released a list of 55 higher education institutions under investigation for possible violations of federal law over the handling of sexual violence and harassment complaints. UW-Whitewater was one of the listed institutions.

46.     In October 2014, Jane Doe #1, a UW-Whitewater student, reported to university administrators that she was raped by another student.

47. Despite being under federal investigation for its failures to appropriately handle sexual assault and harassment complaints, according to Jane Doe #1, UW-Whitewater did not appropriately respond to Jane Doe #1's sexual assault complaint.

48. Jane Doe #1 filed a complaint against UW-Whitewater, alleging that the then UW-Whitewater Dean of Students violated Jane Doe #1's civil rights by failing to interview witnesses and by not accepting the police report or medical records.

49. Jane Doe #1 also alleged UW-Whitewater failed to protect her by refusing to remove the sexual assault perpetrator from Jane Doe #1's classes.

50. Jane Doe #1's complaints were widely publicized in the media.

51. UW-Whitewater has a history of retaliating against those who report assaults, failing to appropriately respond to sexual violence and harassment complaints, and failing to protect its students.

52. As a result of UW-Whitewater's unreasonable and deliberate indifference, and its history of retaliating against those who reported sexual assault, students, university staff, and employees, and specifically Stephanie, were reluctant to come forward with reports about sexual assault and harassment, out of fear they would be punished. This made it easier for individuals like Hill to engage in sexually harassing and assaultive behavior.

**Hill Sexually Assaults Stephanie**

53. In fall 2015, Stephanie enrolled in UW-Whitewater's Master of Business Administration degree program.

54. While in the process of obtaining her master's degree, Stephanie continued to serve as a member of the City Council in Whitewater, and on the City of Whitewater's Technology Park Board.

55.     The Technology Park Board oversees the development of the 130-acre UW-Whitewater University Technology Park.

56.     On October 21, 2015, Stephanie attended a Technology Park Board meeting. This meeting was also attended by Chancellor Kopper.

57.     After the meeting, Stephanie drove to the Sweet Spot, a coffee shop in Whitewater frequented by UW-Whitewater students and employees.

58.     After exiting her vehicle, Stephanie saw Hill leaving the Sweet Spot. Hill also saw Stephanie and made his way toward her.

59.     As Hill approached, Stephanie commented that she just left a meeting with Hill's wife. Stephanie mentioned Chancellor Kopper as much as possible to remind Hill that he was married and that Stephanie knew his wife, in hopes this would stop Hill from making inappropriate comments or initiating unwanted physical contact with Stephanie.

60.     This tactic did not deter Hill. Hill initiated a full-frontal hug of Stephanie without her consent. As he pinned Stephanie against his body, Hill slid his hand down Stephanie's backside, where he then forced his hand between Stephanie's body and skirt and grabbed Stephanie's buttocks underneath her clothing. This happened so quickly that Stephanie was unable to escape Hill's grasp. After assaulting Stephanie, Hill said, "Have a great day."

61.     After Hill sexually assaulted Stephanie in October 2015, he continued to engage in predatory sexual harassment of Stephanie, including hugging Stephanie at events without her consent.

62.     Hill would often wink at Stephanie, which made Stephanie feel unsafe. Stephanie perceived Hill's winking as him stating, "You're still not safe from me."

63.     On October 28, 2015, Stephanie attended the annual Discover Whitewater Series banquet, which was also attended by Chancellor Kopper and Hill. During this event, Hill repeatedly put his arm around Stephanie's body without Stephanie's consent. While doing so, Hill winked at Stephanie.

64.     At the time Hill was touching Stephanie without her consent and winking at her, Chancellor Kopper was standing next to Hill, within sight of both Stephanie and Hill. Despite this, Chancellor Kopper did not take any action to stop Hill's behavior.

65.     Stephanie ultimately told another common council member about the sexual harassment and assault by Hill. This council member was employed by Compass Group USA Inc. d/b/a Chartwells Dining Service ("Chartwells"). At the time, Chartwells was the food services provider for UW-Whitewater and provided catering services for UW-Whitewater events. Chartwells would often provide catering services for events at Chancellor Kopper's home.

66.     After learning Hill sexually harassed and assaulted Stephanie, the council member stopped sending women to Chancellor Kopper's home for events in an attempt to prevent Chartwells' female employees from being sexually harassed and assaulted by Hill.

**Hill Sexually Harasses and Assaults Jane Doe #2**

67.     During his time as Associate of the Chancellor, Hill engaged in a pattern of predatory sexual harassment and assaultive behavior with other female UW-Whitewater students and employees.

68.     After meeting a UW-Whitewater female student or employee, Hill would often initiate unwanted side hugs. Over time, Hill would escalate side hugs to full frontal hugs. Hill would then initiate unwanted kissing and/or sexual contact. Hill would ask female students

9

and employees to meet him off campus under the guise of discussing their future or career advancement.

69.     In 2016, Jane Doe #2 was enrolled as a graduate student and was working in the Chancellor's Office. While working in the Chancellor's Office in May 2016, Hill came into the office and introduced himself to Jane Doe #2.

70.     After this introduction, Jane Doe #2 was asked, as part of her job duties, to read newspapers and cut out any articles related to UW-Whitewater for Hill. Beginning in late June 2016, Hill began coming into the Chancellor's Office approximately two times a week to pick up these articles.

71.     Hill would initiate unwanted hugs with Jane Doe #2 when he came into the Chancellor's Office.

72.     On numerous occasions, Hill kissed Jane Doe #2 on her neck without her consent.

73.     On another occasion, Hill stated, "Damn, you look good today."

74.     On July 29, 2016, Hill walked into the Chancellor's Office, noticed Jane Doe #2 was working, and walked behind Jane Doe #2's desk with his arms out, an indication that he—not Jane Doe #2—wanted a hug. When Jane Doe #2 stood up, Hill said, "Damn." Hill initiated a non-consensual full frontal hug that lasted 10-20 seconds. While hugging Jane Doe #2, Hill stated, "How long can we do this?" Hill then kissed Jane Doe #2 on the neck. As Jane Doe #2 pulled away, Hill slapped Jane Doe #2 on the buttocks.

75.     In August 2016, Hill met with Jane Doe #2 at the Sweet Spot to discuss her career advancement. Hill brought up the topic of hugs. Jane Doe #2 told Hill she did not like being

10

hugged. Despite this, when Jane Doe #2 stood up, Hill tried to give Jane Doe #2 a hug. Hill stated that he and Jane Doe #2 would have to practice hugging.

76.     Hill told Jane Doe #2, "I'm very attracted to you, but I'm sure you already know that."

77.     After the coffee-shop incident, Jane Doe #2 developed strategies to prevent Hill from touching her. Jane Doe #2 would make sure that she was always holding something in her hands while in Hill's presence so there would be a physical barrier between them.

78.     On August 4, 2016, Hill made an inappropriate comment to Jane Doe #2 and others regarding females and why men prefer guns over women. Hill also commented that "ugly women only get love past 1:00 a.m."

79.     Kari Heidenreich ("Heidenreich"), the Executive Assistant to the Chancellor, and Sara Kuhl ("Kuhl"), the Director of Marketing and Media Relations overheard Hill's inappropriate comments and laughed.

80.     On another occasion, while Jane Doe #2 was alone with Hill in a conference room, Hill stated, "We have to get curtains on those windows." In the context of her prior interactions with Hill, which consisted of unwanted and inappropriate comments and touching by Hill, Jane Doe #2 perceived Hill's comments as yet another sexual innuendo.

81.     At all times relevant to this Complaint, UW-Whitewater had a Sexual Violence, Sexual Harassment and Intimate Partner Violence Policy ("UW-Whitewater Policy") in place.

82.     Heidenreich and Kuhl are both mandatory reporters pursuant to the UW-Whitewater Policy, which provides:

Mandatory Reporting of Sexual Misconduct: Any employee who experiences, witnesses or otherwise becomes aware of an incident, allegation, complaint or information regarding sexual misconduct committed by or against a student, employee, contractor or guest, shall submit a written report of said information to the Title IX Coordinator, Dean of Students Office, Deputy Title IX Coordinators or UW-Whitewater Police Services within 48 hours from the time said information was received or as soon as practicably possible.

83.     There is no evidence that Heidenreich or Kuhl submitted a written report of Hill's sexual misconduct to the Title IX Coordinator, Dean of Students Office, Deputy Title IX coordinators, or UW-Whitewater Police Services.

**Hill Sexually Harasses and Assaults Jane Doe #3**

84.     In June 2014, Jane Doe #3, a UW-Whitewater student, began working as an employee of Chartwells.

85.     Jane Doe #3 predominantly worked events at the University Center and the Chancellor's home.

86.     Jane Doe #3 met Hill for the first time while working at Chancellor Kopper's 2015 inauguration party.

87.     Upon information and belief, at this time, Jane Doe #3 was approximately 20 years old, and Hill was 68 years old.

88.     While Jane Doe #3 was working at events Hill attended in the fall of 2015, Hill began initiating unwanted side and full frontal hugs with Jane Doe #3. When forcing hugs upon Jane Doe #3, Hill would grab Jane Doe #3's waist or lower back to pull Jane Doe #3 closer.

89.     Over time, Hill's predatory behaviors with Jane Doe #3 escalated from unwanted side hugs to unwanted kisses.

90.     In April 2017, Hill grabbed Jane Doe #3's buttocks while she was working at Chancellor Kopper's home.

91.     During the period of time Jane Doe #3 was an employee of Chartwells, she worked closely with Bob Barry ("Barry") and Angela Meladonia ("Meladonia"). At the time, Barry was the Executive Director of the University Center, and Meladonia was the Associate Director.

92.     Barry and Meladonia frequently referred to Jane Doe #3 as "Pete's favorite." Both Barry and Meladonia would ensure that Jane Doe #3 was working the University Center events scheduled to be attended by Hill.

93.     In 2017, the Hawk Squad had a training event in the UW-Whitewater University Center. The Hawk Squad is comprised of UW-Whitewater students. The Hawk Squad leads new students through orientation, provides campus tours, and serves as a campus resource to students and their families.

94.     Chartwells provided catering services at the Hawk Squad training event.

95.     While working the event, Jane Doe #3 ran into a former college friend, who was attending the training session. Jane Doe #3 told her friend she hated going to Chancellor Kopper's house because Hill always made inappropriate comments or attempted to inappropriately touch Jane Doe #3.

96.     Jane Doe #3's friend immediately reported Jane Doe #3's complaint to Beth John ("John"), the Director of First Year Experience, a UW-Whitewater program.  John is a mandatory reporter.

97.     Despite the report to UW-Whitewater, no immediate action was taken to protect Jane Doe #3 or other female UW-Whitewater students or employees from Hill. There is no record of John submitting a written report of the sexual misconduct to the Title IX Coordinator, Dean of Students Office, Deputy Title IX Coordinators or UW-Whitewater Police Services.

## First Formal Investigation into the Inappropriate,
## Sexually Harassing, and Assaultive Behavior of Hill

98.     In May 2017, Jane Doe #3 met with Artanya Wesley ("Wesley"), the Dean of Students, to discuss the inappropriate actions of Hill.

99.     Jane Doe #3 met with Wesley on campus at Hyer Hall, the same location as Chancellor Kopper's office. During Jane Doe #3's meeting with Wesley, Jane Doe #3 was frightened by the thought of seeing Chancellor Kopper or one of her assistants while at Hyer Hall.

100.    Wesley informed Jane Doe #3 there was not much that could be done because Hill was not an employee of UW-Whitewater. Wesley stated that UW-Whitewater could not fire Hill because he was not an employee.

101.    Upon information and belief, the Board of Regents thereafter hired a male private investigator to investigate.

102.    Section VI of the UW-Whitewater Policy provides:

> Upon receipt of a report or complaint of a violation of this policy, the appropriate office or UW-Whitewater official shall conduct an initial assessment of the allegations contained in the complaint and determine whether interim measures or accommodations (See Appendix A for definitions) should be provided in order to prevent further harassment or retaliation against the complainant(s), witness or respondent(s). The purpose of an interim measure(s) or accommodation(s) shall be to prevent further harassment or retaliation during the pendency of the complaint and investigative process.

103.    There is no evidence that an assessment of the allegations was made to determine whether interim measures or accommodations should be provided to prevent further harassment or retaliation against Jane Doe #3 or other female employees or students.

104.    No interim measures were put in place to protect Jane Doe #3 or other women during the pendency of the investigation.

14

105. While questioning Jane Doe #3, the investigator informed Jane Doe #3 that he had already spoken with Hill. Hill denied having met Jane Doe #3 and denied knowing anyone working in the catering business by the name of [Jane Doe #3].

106. The private investigator wrongfully concluded that Jane Doe #3's complaints could not be substantiated.

107. After the investigation, no measures were put in place to protect Jane Doe #3 or female students and employees from Hill. However, Paige Smith a/k/a Paige Reed ("Smith"), the Chief of Institutional Policy and Compliance and Title IX Coordinator, provided Chancellor Kopper with the advice that Hill should be aware of the complaint and "watch his actions and spirits around students."

108. After the investigation, Wesley called Jane Doe #3. Wesley reiterated that Hill could not be fired because he was not an employee of UW-Whitewater. Wesley stated that Hill was going to be required to take a course on sexual harassment. Wesley apologized that UW-Whitewater could not fire Hill and stated that, as an alternative, UW-Whitewater could remove Jane Doe #3 from further contact with Hill.

109. After the investigation, Jane Doe #3's work hours were subsequently cut and she no longer worked any events at Chancellor Kopper's residence. Jane Doe #3 did, however, continue to get scheduled to work at events attended by Hill at other locations. Seeing Hill at these events made Jane Doe #3 uncomfortable and, at times, physically ill.

110. While working an all-campus event, Jane Doe #3 saw Hill walk in the door. Upon seeing him, Jane Doe #3 ran into the kitchen and threw up.

111. On October 13, 2017, Jane Doe #3 worked at the dedication ceremony for the Mary Poppe Chrisman Success Center. This event was attended by Hill. While working this

event, Hill grabbed Jane Doe #3's arm and stated, "[Jane Doe #3], honey, could you get me a whiskey."

112.    In May 2018, Jane Doe #3 quit her job and moved from Whitewater. One of the reasons Jane Doe #3 left her job and Whitewater was that she no longer felt like her place of employment was a safe space.

### UW-Whitewater Fails to Ensure Hill's
### Participation in Sexual Harassment Counseling and Training

113.    After the 2017 investigation, Hill was ordered to be personally counseled about sexual harassment by Shenita Brokenburr, the University of Wisconsin System Administration's Head of Human Resources. There is, however, no record of this counseling ever occurring, and no evidence that UW-Whitewater ever followed up to require Hill to complete such counseling.

114.    In 2018, Hill sought exemption from mandatory sexual harassment awareness training. This request was granted by UW-Whitewater administrators.

115.    At all times relevant to this Complaint, the Board of Regents had a Sexual Violence and Sexual Harassment Policy ("UW System Policy") in place. Section 6(C) of this policy provides, "At a minimum, all UWSA employees will be required to complete the UWSA-supported on-line training covering issues of sexual violence and sexual harassment."

116.    Pursuant to Section 6(D) of the UW System Policy, the Title IX Coordinator is responsible for "track[ing] compliance with mandatory training programs, and maintain[ing] a list of training and education options." There are no provisions allowing for exemption from the training.

117.    The UW-Whitewater Policy has similar provisions. Section XV of this policy provides that "employees will be required to complete an on-line training that addresses

issues of sexual violence and sexual harassment in accordance with the U.S. Department of Education, Office for Civil Rights' guidance."

118.    Pursuant to Section XI of the UW-Whitewater Policy, the "Title IX Coordinator will track compliance with mandatory training programs . . . ."

119.    The UW System Policy and the UW-Whitewater Policy were violated by the failure of Smith to ensure that Hill completed sexual harassment counseling with Shenita Brokenburr and the mandatory sexual violence and sexual harassment training.

120.    Despite UW-Whitewater's knowledge of Hill's years-long history of sexual harassment and assaultive behavior, UW-Whitewater failed to take any action, causing the needless exposure of multiple female students and employees to Hill's sexually harassing and assaultive behavior.

**Hill Sexually Harasses and Assaults Jane Doe #4**

121.    Jane Doe #4 was an employee of UW-Whitewater.

122.    In 2015, Hill walked into Jane Doe #4's office and shut the door behind him. Hill walked around Jane Doe #4's desk, gave Jane Doe #4 an unwanted full frontal hug and whispered in Jane Doe #4's ear.

123.    On another instance in 2015, Hill invited Jane Doe #4 into a room. As Jane Doe #4 walked into the room, Hill stood inappropriately close to her. Hill put his hands on Jane Doe #4's face and leaned in for what Jane Doe #4 thought would be a kiss on the mouth. Jane Doe #4 turned her head, and Hill kissed her on the cheek and whispered in her ear.

124.    In January 2018, Smith was notified of Jane Doe #4's complaints about Hill's inappropriate actions.

125.     Smith spoke with Jane Doe #4, but because of the environment created by UW-Whitewater, Jane Doe #4 was reluctant to come forward and make a formal complaint. Smith stated, "If it's any consolation, you aren't the only one."

126.     Smith had knowledge of Hill's sexually harassing behaviors. Despite this knowledge, Smith failed to take any action to stop Hill. There is no evidence that an assessment of Jane Doe #4's allegations was made to determine whether measures or accommodations should be provided to prevent further harassment or retaliation against Jane Doe #4 or other female employees or students. In fact, no measures were put in place. Jane Doe #4 continued to be sexually harassed by Hill.

127.     In February 2018, Hill put his hand on the lower back of Jane Doe #4 and pulled her closer to him. As he pulled Jane Doe #4 closer to his body, Hill whispered into Jane Doe #4's ear, "You look really good, [Jane Doe #4]."

128.     In April 2018, Jane Doe #4 attended an event that was also attended by Chancellor Kopper and Hill. Jane Doe #4 sat between Chancellor Kopper and Hill. While seated, Hill grabbed Jane Doe #4's knee under the table at least three times.

129.     In April 2018, Jane Doe #4 met again with UW-Whitewater staff to discuss additional complaints against Hill. Jane Doe #4 left the meeting with the feeling that her employment would not be protected.

### Second Formal Investigation into the Inappropriate, Sexually Harassing, and Assaultive Behavior of Hill

130.     On April 20, 2018, the Board of Regents entered into a contract with Special Investigator, Shannon E. Bradbury ("Bradbury"), for Bradbury's services in conducting a personnel investigation related to the actions of Hill against Jane Doe #4.

131.     There is no evidence that an assessment of the allegations was made to determine whether measures or accommodations should be provided to prevent further harassment or retaliation against Jane Doe #4 or other female employees or students.

132.     No measures were put in place to protect Jane Doe #4 or other female employees or students.

133.     Stephanie heard from UW-Whitewater's then athletic Director, Todd Garzarelli, that an investigation into Hill's behavior was underway and that Hill had been banned from campus.

134.     Based upon her understanding that Hill was banned from campus, Stephanie made plans to attend the Purple and White Gala, which was intended as a celebration of UW-Whitewater's 150th anniversary.

135.     Stephanie was looking forward to attending the gala without the fear of being sexually harassed or assaulted by Hill.

136.     The gala occurred on April 21, 2018, one day after the Board of Regents entered into a contract for Bradbury's investigation into the behaviors of Hill.

137.     The rumors throughout campus were not true—Hill was not banned from campus.

138.     Not only was Hill not banned from campus, he was invited to enjoy a cocktail hour, four-course dinner, and dancing at the Purple and White Gala, all while under investigation for sexually harassing and assaulting female students and employees at similar events.

139.     While attending the gala, Hill winked at Stephanie and made finger gun gestures at her, which frightened Stephanie and made her feel unsafe.

140.     Stephanie never would have attended the gala had she known that Hill would be in attendance.

141.     After conducting her investigation, Bradbury concluded that Hill engaged in conduct that met the standard for creating a hostile work environment.

142.     In her June 12, 2018, report, Bradbury stated:

Mr. Hill's conduct towards Jane Doe #4 constitutes "unwelcome physical conduct of a sexual nature", the submission to which may be considered implicitly a condition of her employment. This physical conduct interferes with her ability to work.

Mr. Hill's conduct also meets the standard for creating a hostile work environment. His physical acts have taken place frequently enough to be considered pervasive, and they interfered with Jane Doe #4's working environment so that she was trepidatious about every potential encounter. A reasonable person would find this behavior intimidating.

Mr. Hill's conduct is made more offensive because he holds a position of power over Jane Doe #4 and over other employees at UWW due to his familial relationship with the Chancellor. Should anyone reject or rebuff Mr. Hill's physical contact, there is always the unspoken presumption that the Chancellor could end that employee's employment should Mr. Hill request it. In this way, a harasser can continue his or her behavior long after he or she should have been found out because the targets are too intimidated and vulnerable to step forward.

143.     Despite the serious and concerning conclusions reached by Bradbury on June 12, 2018, UW-Whitewater and the Board of Regents failed to immediately ban Hill from campus.

144.     Hill was finally banned from campus on June 22, 2018, but not before he harassed and assaulted many innocent, female UW-Whitewater students and employees over a period of years.

145.    Although the University of Wisconsin System and UW-Whitewater anointed Hill with the status and title of "Associate of the Chancellor," thereby holding him out to be some sort of honorable member of the campus and greater Whitewater community, after the Bradbury investigation, the Board of Regents and UW-Whitewater took no action to warn students, faculty, or staff of Hills' inappropriate, sexually harassing, and assaultive behavior.

146.    On July 17, 2018, a reporter with the *Milwaukee Journal Sentinel* submitted a public record request for records pertaining to the investigation of Hill.

147.    Via email on September 14, 2018, at 10:01 a.m., the University of Wisconsin System responded to this record request with responsive records.

148.    Via email on September 14, 2018, at 10:01 a.m., Chancellor Kopper, for the first time, notified campus colleagues of Hill's ban from campus.

149.    Despite UW-Whitewater and Chancellor Kopper's claims that they strive to create a safe environment for students, faculty, and staff, UW-Whitewater and the Board of Regents failed to notify students, faculty, and staff of an unsafe predator in the community until the *Milwaukee Journal Sentinel* forced their hands through its public record request.

150.    The failure of the Board of Regents and UW-Whitewater to inform students and staff of Hill's ban from campus was questioned by legislative staff and the media.

151.    Mike Mikalsen, Senator Steve Nass' chief of staff, questioned President Cross on Chancellor Kopper's failure to notify the campus community of Hill's ban from campus:

> QUESTION 1 – The records provided and our inquiries with some individuals on these campuses would suggest that even though you ordered this action on June 22, 2018, there was no effort undertaken by Chancellor Kopper to notify key individuals or the campus community of Mr. Hill's restrictions until release of a statement on September 14, 2018. Chancellor Kopper's statement on September 14th only occurred because the UW System was releasing records to Karen Herzog of the Milwaukee Journal Sentinel at 10:00 A.M. on

that day. . . . If these observations are correct, can you provide us with an explanation as to why key individuals and the campus community were not provided with information either by Chancellor Kopper or UW System prior to September 14?

152.     Karen Herzog of the *Milwaukee Journal Sentinel* similarly questioned the Board of Regents.

1) Is there a policy that specified what is to happen when someone is banned from campus? I.e. is the campus police department to be notified? Others? Thinking about Jeff Decker case. The word was put out that if anyone saw him on campus, they were to report him to police. His photo was up in the police department HWhat [sic] was done to enforce the restrictions against Mr. Hill? And what was he told about restrictions against him? The letter to him just told him to turn in his badge.

2) Shouldn't the findings of this independent investigation been made public in June? I realize it's a personnel matter. But Mr. Hill was in a position of public prominence, and he was banned in order to protect employees. How could that ban be effective if no one knew about it? And how were you protecting employees and students if you did not make them aware that he had a pattern of behavior, as noted in the independent investigator's report?

153.     These questions went unanswered by President Cross and the Board of Regents.

### Third Formal Investigation into the Inappropriate, Sexually Harassing, and Assaultive Behavior of Hill

154.     The results of Bradbury's investigation were highly publicized by local and national media on and shortly after September 14, 2018. As a result of this publicity, additional women came forward with public complaints against Hill.

155.     On September 19, 2018, another personnel investigation into Hill's actions was commenced at the request of Cross and the Board of Regents.

156.     This investigation resulted in the conclusion that Hill engaged in sexual harassment of both employees and students.

## UW-Whitewater Had Knowledge of Hill's
## Abusive Behavior But Failed to Take Action

157.     UW-Whitewater was aware of Hill's inappropriate, sexually harassing, and assaultive behavior. Despite this knowledge, UW-Whitewater failed to act in a timely manner, needlessly subjecting female students and employees, including Stephanie, to Hill's unwanted advances.

158.     Jane Doe #5 and Jane Doe #6, both employees of UW-Whitewater, provided statements to investigators about unwanted physical contact initiated by Hill.  Both complained that Hill frequently made comments laden with sexual innuendo.  These employees had not previously filed complaints out of fear they would be retaliated against by UW-Whitewater.

159.     Jane Doe #7, also a UW-Whitewater employee, reported that during a meeting in her office, Hill grabbed her shoulders with both hands and demanded that she kiss him.

160.     Jane Doe #8, upon information and belief, a UW-Whitewater employee, filed an anonymous complaint regarding Hill's sexual harassment. The anonymous complaint was consistent with complaints made by other students and employees regarding Hill's sexually harassing and assaultive behavior.

161.     Jane Doe #9, upon information and belief, was a UW-Whitewater employee. While traveling, Jane Doe #9 reported to another UW-Whitewater employee that Jane Doe #9 had been sexually harassed by Hill.

162.     Jane Doe #10, upon information and belief, was a UW-Whitewater employee. While at a campus event, Hill commented that it was nice to see Jane Doe #10 and told her, in a low voice, how good she looked. While making comments on Jane Doe #10's appearance, Hill pulled Jane Doe #10 close to him. Jane Doe #10 could feel Hill's penis on her leg. While Hill

rubbed his penis against Jane Doe #10's leg, Chancellor Kopper was standing next to Hill and Jane Doe #10.

163.    Aimee Arnold ("Arnold"), upon information and belief, was an employee of UW-Whitewater from 2007-2008 and 2010-2017.  During that time, Arnold was a member of Chancellor Kopper's cabinet.  Arnold interacted with Hill at UW-Whitewater events.  Arnold described Hill as "creepy," and a "two-handed hugger."  Hill would call Arnold "honey," "sweetie," or "baby," which made Arnold uncomfortable.  Due to her level of discomfort with the actions of Hill, Arnold would ensure that she was always at least an arm's length away from Hill. Arnold also advised a woman in her office to avoid engaging with Hill.

164.    Arnold spoke with Judi Trampf ("Trampf"), Director of Human Resources and Diversity, regarding whether Arnold was permitted to instruct her employees not to meet with Hill alone.  Arnold was concerned she would be fired if she provided her employees with such instructions.

165.    Arnold and Trampf are both mandatory reporters pursuant to the UW-Whitewater Policy.  There is no evidence that Arnold or Trampf submitted a written report of Hill's sexual misconduct to the Title IX Coordinator, Dean of Students Office, Deputy Title IX Coordinators, or UW-Whitewater Police Services.

166.    Yet another UW-Whitewater employee reported being sexually harassed by Hill while the two were traveling together.

167.    The 2018 investigation initiated by Cross and the Board of Regents resulted in the following findings:

> Based on the investigation that has been completed to date, we conclude that there is credible evidence that Pete Hill engaged in sexual harassment of both employees and students (who were either employed directly by UWW or by companies that contracted with

24

UWW) and that these incidents occurred, mainly, on campus or UWW-related properties, like the Chancellor's residence during official events.

. . .

The large number of complainants suggest that Hill's unprofessional and improper behavior toward women was pervasive and well-known; indeed, a number of university employees made note of his behavior and took steps to protect one another from Hill.

168.    The 2018 Investigation concluded: "There is credible evidence that Alan Hill sexually harassed employees and students at the University of Wisconsin Whitewater."

169.    From the time she first met Hill, until Hill was banned from campus in 2018, Stephanie was victimized by Hill's sexually harassing and assaultive behavior. Stephanie knew other female UW-Whitewater students and employees were also being victimized by Hill, but like them, Stephanie was afraid to do anything because of the hostile environment created by the unreasonable and deliberate indifference of UW-Whitewater to such conduct, and its history of retaliating against victims.

170.    Stephanie's repeated exposure to Hill's sexually harassing and assaultive behavior caused Stephanie to suffer severe physical and emotional injuries, including headaches, insomnia, low energy, and muscle tension. Stephanie has been diagnosed with post-traumatic stress disorder and a major depressive disorder, caused by the inappropriate actions of Hill, which require ongoing medical treatment.

## FIRST CAUSE OF ACTION: VIOLATION OF TITLE IX

Stephanie realleges and incorporates herein by reference paragraphs 1 through 170 of the Complaint.

171.    Title IX of the Education Amendments of 1972 ("Title IX") directs, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Title IX is a critical tool in the battle against campus sexual harassment and assaults.

172. Title IX applies to education institutions that receive federal funding. At all times relevant to this Complaint, UW-Whitewater has been the recipient of federal funding.

173. Under Title IX regulations, UW-Whitewater is required to adopt and publish grievance procedures and to promptly and equitably resolve complaints concerning conduct prohibited by Title IX.

174. Through its unreasonable and deliberate indifference, UW-Whitewater permitted Hill to engage in sexual harassment and subjected and exposed Stephanie and other UW-Whitewater female students and employees to a years-long sexually hostile educational environment, at the hands of Hill, in violation of Title IX.

175. UW-Whitewater discriminated against Stephanie by subjecting her to a severe, pervasive, and objectively offensive hostile environment, which interfered with Stephanie's education opportunities and detracted from Stephanie's school experiences in violation of Title IX. UW-Whitewater acted maliciously towards Stephanie, and with an intentional disregard of Stephanie's rights.

176. UW-Whitewater had notice of the years-long sexual harassment and assaults committed by Hill, which Stephanie and other were forced to endure, but failed to take appropriate action to stop that conduct, in violation of Title IX.

177. As a result of Hill's sexually assaultive and harassing behavior, Stephanie was deprived of access to the educational opportunities and benefits provided by UW-Whitewater in violation of Title IX.

178. Stephanie was ultimately forced to drop out of the UW-Whitewater MBA program, due to the mental and physical anguish she suffered as a result of Hill's harassing and assaultive behavior and the public ridicule she endured after reporting Hill's inappropriate conduct.

179. As a result of UW-Whitewater's unlawful conduct, Stephanie has suffered and will continue to suffer harm, including, but not limited to, past and future loss of educational and employment opportunities, humiliation, embarrassment, reputational harm, severe psychological and emotional harm, past and future pain and suffering, past and future loss of earnings, and other damages.

180. Stephanie is entitled to all legal and equitable remedies available under Title IX.

## SECOND CAUSE OF ACTION:
## VIOLATION OF EQUAL PROTECTION CLAUSE

Stephanie realleges and incorporates herein by reference paragraphs 1 through 180 of the Complaint.

181. This is an action pursuant to 42 U.S.C. § 1983, for violation of Stephanie's equal protection rights under both the United States Constitution and the Wisconsin Constitution.

182. UW-Whitewater appointed Hill to the position of Associate of the Chancellor. Through this position, Hill, acting under color of law, attended events and meetings, where Hill acted in a ceremonial position with actual and apparent authority to represent UW-Whitewater. Hill used his position as Associate of the Chancellor to gain access to female UW-Whitewater students and employees, including Stephanie. Hill used his position and access to sexually harass and assault female UW-Whitewater students and employees, including Stephanie.

183. Hill used his position as Associate of the Chancellor to lure female UW-Whitewater students and employees, including Stephanie, into close one-on-one situations, under

the guise of providing career and development advice, in order to sexually harass and assault these women. Because of Hill's elevated position as Associate of the Chancellor, the deliberate indifference of UW-Whitewater, and its history of retaliation against victims and reporters of sexual assault, these female students and employees, including Stephanie, were reluctant to come forward for fear they would be punished.

184. UW-Whitewater knew about, condoned and ratified Hill's conduct, repeatedly dismissing or ignoring evidence of Hill's years-long inappropriate treatment of females, giving Hill unfettered power to harass and assault women, including Stephanie.

185. UW-Whitewater repeatedly and systematically treated Stephanie and other UW-Whitewater female students and employees differently, based upon gender, through its unreasonable and deliberate indifference to sexually harassing and assaultive behavior, creating an environment which facilitated Hill's inappropriate behavior towards female UW-Whitewater students and employees.

186. Stephanie's right to equal protection under the law to be free from gender discrimination was violated by such unreasonable, intentional and deliberate indifference, which permitted Hill to engage in sexually harassing and assaultive behavior for years before he was finally banned from campus.

187. Stephanie is entitled to all legal and equitable remedies available to her as a result of the violation of her right to equal protection under the law by UW-Whitewater.

**THIRD CAUSE OF ACTION: VIOLATION OF DUE PROCESS CLAUSE**

Stephanie realleges and incorporates herein by reference paragraphs 1 through 187 of the Complaint.

188.     This is an action pursuant to 42 U.S.C. § 1983 for violation of Stephanie's substantive due process rights under the United States Constitution and the Wisconsin Constitution.

189.     The Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 1 of the Wisconsin Constitution provide protection against governmental actions that are without reasonable justification in the service of legitimate government objectives.

190.     UW-Whitewater has a history of retaliating against those who report sexually harassing or assaultive behavior, a history of failing to appropriately respond to complaints of sexual harassment or assault and a history of failing to protect its female students and employees.  Through its unreasonable and deliberate indifference, UW-Whitewater and the Board of Regents created an environment in which female UW-Whitewater students and employees were afraid to come forward with complaints about sexual harassment or assault out of fear they would be punished.  These actions were accomplished under color of law.

191.     By creating an environment in which sexually harassing and assaultive behavior towards females was allowed to occur unchecked, by conducting late and ineffective investigations that failed to prevent ongoing harassment or eliminate fears of retaliation, UW-Whitewater violated and deprived Stephanie of her substantive due process rights.

192.     Hill took advantage of his heightened status as Associate of the Chancellor, and the hostile environment created by UW-Whitewater by sexually harassing and assaulting Stephanie in violation of Stephanie's right to bodily integrity, depriving Stephanie of her substantive due process rights.

193.     Stephanie is entitled to all legal and equitable remedies available to her as a result of the violation of her substantive due process rights by UW-Whitewater.

**WHEREFORE**, Stephanie requests judgment against Defendant as follows:

a.      Declaring that the actions of Defendant were illegal and improper, in violation of Title IX, and in violation of the equal protection and due process clauses of the United States Constitution and the Wisconsin Constitution;

b.      For compensatory damages in an amount to be determined;

c.      For punitive damages in an amount to be determined;

d.      For an award of Stephanie's actual, reasonable attorney fees, pursuant to 42 U.S.C. § 1988;

e.      For Stephanie's costs and disbursements incurred in bringing this action; and

f.      For such other and further relief as the Court may deem just and equitable.

Dated this 5th day of October, 2021.

GODFREY, LEIBSLE,
   BLACKBOURN & HOWARTH, S.C.
Attorneys for Plaintiff


By:  Electronically signed by Lisle W. Blackbourn
      Lisle W. Blackbourn (1003897)
      Janel Bergsbaken (1090500)


**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**


Lisle W. Blackbourn
GODFREY, LEIBSLE,
   BLACKBOURN & HOWARTH, S.C.
354 Seymour Court
Elkhorn, WI 53121
Telephone: 262-723-3220
Facsimile: 262-723-7538
Email: lblackbourn@godfreylaw.com
T:\V\Vander Pas\Stephanie\UW-Whitewater\off copy\Complaint - FINAL.docx