# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| STEPHANIE GOETTL VANDER PAS,<br><br>                    Plaintiff,<br><br>v.<br><br>BOARD OF REGENTS OF THE<br>UNIVERSITY OF WISCONSIN<br>SYSTEM,<br><br>                    Defendant. | Case No. 21-CV-1148-JPS<br><br><br>**ORDER** |

This case comes before the Court on (1) Defendant Board of Regents of the University of Wisconsin System's (the "Board") motion to dismiss for failure to state a claim, and (2) Plaintiff Stephanie Goettl Vander Pas's ("Vander Pas") motion to amend her Complaint. ECF Nos. 9, 15. Both motions are fully briefed. For the reasons stated herein, the Court grants in part and denies in part the Board's motion to dismiss. The Court grants Vander Pas's motion to amend her Complaint.

## 1. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b) provides for the dismissal of complaints which, among other things, "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief,

raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (internal citation omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81. However, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citing *Twombly*, 550 U.S. at 555–56).

2.     **RELEVANT ALLEGATIONS**

2.1     **UWW's History of Deliberate Indifference**

According to Vander Pas, the University of Wisconsin-Whitewater ("UWW") has an extensive "history of deliberate indifference to sexual harassment and assault." ECF No. 1 at 5. Indeed, UWW is one of 55 higher education institutions under investigation by the U.S. Department of Education ("DOE") for mishandling sexual violence and harassment reports. *Id.* at 6.

For example, in January of 2013, Timothy Fader ("Fader"), the former wrestling coach, reported a sexual assault to the Athletic Director. *Id.* at 5. The Athletic Director did not record the report. *Id.* In April of 2014, Fader reported another sexual assault directly to the police. *Id.* Fader was thereafter terminated from his UWW position. *Id.* Fader's termination was highly publicized by the media. *Id.* at 6. Vander Pas contends that "[t]he firing of Fader and the resulting publicity made it abundantly clear to [UWW] employees and students, and specifically [Vander Pas], that those who report instances of sexual assault would themselves be punished." *Id.*

In 2014, a UWW student ("Jane Doe 1")[1] reported that she was raped by a student. *Id.* Jane Doe 1 filed suit against UWW, alleging that UWW did not interview witnesses, accept her police report and medical records, or remove the perpetrator from her classes. *Id.* at 7. Vander Pas contends that, because of this incident, she was "reluctant to come forward with reports about sexual assault and harassment," thus "ma[king] it easier for individuals . . . to engage in sexually harassing and assaultive behavior." *Id.*

### 2.2    Vander Pas's Background and Assault

Vander Pas enrolled as a freshman at UWW in the fall of 2009. *Id.* at 2. On December 2, 2009, Beverly Kopper ("Kopper") was hired as UWW's Provost and Vice Chancellor for academic affairs. *Id.* at 3. Kopper's husband was Alan Hill a/k/a Pete Hill ("Hill"). *Id.* at 2. Vander Pas held a variety of leadership positions at UWW and in the City of Whitewater, which led her to attend many UWW-sponsored events and gatherings. *Id.* at 3.

In December of 2012, Vander Pas attended a party where she met Hill, who she alleges "had a reputation throughout the [UWW] community as a man who frequently initiated unwanted physical contact with [UWW] female students and employees." *Id.* During the party, Hill told Vander Pas that she was a "very pretty girl." *Id.* Until her graduation in the spring of 2013, Vander Pas contends that she had "unavoidable contact" with Hill at UWW-sponsored events and gatherings. *Id.* Hill continued to make comments to Vander Pas, such as, "You are a beautiful woman," "That dress fits you just right," "I don't know why you are with him," and "There are other guys who would like to have a chance with you." *Id.* at 4.

---

[1] The Court adopts the Jane Doe names recited herein from Vander Pas's Complaint. ECF No. 1.

On May 26, 2015, UWW announced Kopper as the new Chancellor. *Id.* On May 27, 2015, the University of Wisconsin System's President, Ray Cross ("Cross"), appointed Hill a "member of the academic staff" with the title Associate of the Chancellor. *Id.* Hill accepted the position. *Id.* at 5.

In the fall of 2015, Vander Pas re-enrolled at UWW to pursue her MBA. *Id.* at 7. Vander Pas continued to hold leadership positions in the UWW and Whitewater communities. *Id.* After a UWW meeting in October of 2015, Vander Pas drove to a coffee shop where she ran into Hill. *Id.* at 8. Vander Pas, hoping to "stop Hill from making inappropriate comments or initiating unwanted physical contact," told Hill that she had just left a meeting with Kopper. *Id.* Nonetheless, Hill initiated a full-frontal hug of Vander Pas without her consent. *Id.* During the hug, Hill "forced his hand between [Vander Pas's] body and skirt and grabbed [her] buttocks underneath her clothing." *Id.* Vander Pas was unable to escape. *Id.* Afterwards, Hill told Vander Pas to "[h]ave a great day." *Id.*

Thereafter, Hill frequently hugged and winked at Vander Pas. *Id.* On October 28, 2015, Vander Pas attended a Whitewater banquet. *Id.* at 9. During the banquet, Hill "repeatedly put his arm around [Vander Pas's] body without [her] consent" and winked at Vander Pas. *Id.* While Hill was touching and winking at Vander Pas, Kopper was standing right next to Hill. *Id.*

**2.3   Hill's Conduct Towards Other UWW Students and Employees**

Vander Pas alleges many examples of conduct perpetrated by Hill towards UWW students and employees, which she contends form "a pattern of predatory sexual harassment and assaultive behavior." *Id.* at 9.

For example, during the fall of 2015, a UWW student ("Jane Doe 3") worked at events that Hill attended. *Id.* at 12. At these events, Hill initiated unwanted hugs with Jane Doe 3, during which he grabbed her waist or lower back to pull her closer. *Id.* Hill also kissed Jane Doe 3 and grabbed her buttocks during events at Kopper's home. *Id.* Bob Barry and Angela Meladonia, Executive Director and Associate Director of the UWW University Center, referred to Jane Doe 3 as "Pete's favorite" and ensured that she was staffed on events attended by Hill. *Id.* at 13.

In 2015, Hill began to give unwanted hugs to a UWW employee ("Jane Doe 4"). *Id.* at 17. In one instance, Hill put his hands on Jane Doe 4's face and leaned in for a kiss. *Id.* Jane Doe 4 turned her head, and Hill kissed her cheek and whispered to her. *Id.* In February of 2018, Hill put his hand on Jane Doe 4's lower back and whispered, "[y]ou look really good, [Jane Doe 4]." *Id.* at. 18. In April of 2018, Hill grabbed Jane Doe 4's knee at least three times at an event where she was seated between Hill and Kopper. *Id.*

In 2016, a UWW graduate student ("Jane Doe 2") was employed by Kopper's office. *Id.* at 10. In May 2016, Hill came into Kopper's office and introduced himself to Jane Doe 2. *Id.* Hill thereafter initiated hugs and kissed Jane Doe 2 on her neck without her consent. *Id.* He also made comments such as, "Damn, you look good today." *Id.* On one occasion, after Jane Doe 2 stood up, Hill said "Damn" and initiated a 10–20-second hug. *Id.* During the hug, Hill commented, "How long can we do this?" *Id.* Hill then kissed Jane Doe 2 on her neck and slapped her on her buttocks. *Id.*

In August of 2016, Jane Doe 2 told Hill that she does not like hugs; Hill encouraged her to "practice hugging." *Id.* at 11. He also told her, "I'm very attracted to you, but I'm sure you already know that." *Id.* On August 4, 2016, Hill told Jane Doe 2 that "ugly women only get love past 1:00 a.m."

*Id.* Both Kari Heidenreich ("Heidenreich") and Sara Kuhl ("Kuhl"), the Chancellor's Executive Assistant and Director of Marketing and Media Relations, overheard and laughed. *Id.* Both Heidenreich and Kuhl are mandatory reporters pursuant to UWW policy. *Id.* That policy provides:

> Mandatory Reporting of Sexual Misconduct: Any employee who experiences, witnesses or otherwise becomes aware of an incident, allegation, complaint or information regarding sexual misconduct committed by or against a student, employee, contractor or guest, shall submit a written report of said information to the Title IX Coordinator, Dean of Students Office, Deputy Title IX Coordinators or UW-Whitewater Police Services within 48 hours from the time said information was received or as soon as practicably possible.

*Id.* at 12. Neither Heidenreich nor Kuhl reported the incident. *Id.*

Aimee Arnold ("Arnold), a UWW employee between 2007 and 2008 and 2010 and 2017, interacted with Hill at UWW events. *Id.* at 24. Hill called Arnold "honey," "sweetie," or "baby," which made Arnold feel uncomfortable. *Id.* Arnold described Hill as "creepy" and a "two-handed hugger," and she advised a woman in her office to avoid engaging with Hill. *Id.* Arnold asked Judi Trampf ("Trampf"), UWW's Director of Human Resources, whether Arnold was permitted to instruct her employees not to meet with Hill alone. *Id.* Arnold was "concerned she would be fired if she provided her employees with such instructions." *Id.* Both Arnold and Trampf are mandatory reporters; neither reported Hill's conduct. *Id.*

In May 2017, following a complaint by Jane Doe 3 to Artanya Wesley ("Wesley"), the UWW Dean of Students, the Board hired a private investigator to investigate Hill's conduct. *Id.* at 14. UWW policy reads:

> Upon receipt of a report or complaint of a violation of this policy, the appropriate office or UW-Whitewater official shall conduct an initial assessment of the allegations contained in

the complaint and determine whether interim measures or accommodations (See Appendix A for definitions) should be provided in order to prevent further harassment or retaliation against the complainant(s), witness or respondent(s). The purpose of an interim measure(s) or accommodation(s) shall be to prevent further harassment or retaliation during the pendency of the complaint and investigative process.

*Id.* Vander Pas alleges that UWW did not assess the allegations, nor did it implement measures or accommodations during the investigation. *Id.* The investigator concluded that the complaint could not be substantiated, and Paige Smith ("Smith"), the Title IX Coordinator, told Kopper that Hill should "watch his actions and spirits around students." *Id.* at 15.

Following this investigation, Shenita Brokenburr, the University of Wisconsin's Head of Human Resources, ordered that Hill be counseled on sexual harassment. *Id.* at 16. Vander Pas contends that no record of the counseling exists and that UWW did not ensure that Hill completed the counseling. *Id.* In 2018, Hill sought an exemption from mandatory sexual harassment awareness training, which UWW granted. *Id.*

Also in 2018, Jane Doe 4 reported Hill's conduct to Smith. *Id.* at 18. Smith told Jane Doe 4, "If it's any consolation, you aren't the only one." *Id.* Smith did not take any further action. *Id.* Jane Doe 4 reported Hill's conduct again in April 2018. *Id.* On April 20, 2018, the Board hired another investigator ("Bradbury") to investigate Hill's conduct. *Id.* Again, UWW did not assess the allegations, or implement interim measures. *Id.* at 19.

### 2.4 Hill's Ban and Further Conduct Towards Vander Pas

As the second investigation commenced, Vander Pas heard that Hill had been banned from campus. *Id.* Based on this, Vander Pas attended a

UWW gala on April 21, 2018. *Id.* Hill was at the gala. *Id.* While at the gala, Hill winked at Vander Pas and made finger gun gestures at her. *Id.*

On June 12, 2018, Bradbury found that Hill had engaged in conduct that created a hostile work environment. *Id.* at 20. Cross banned Hill from campus on June 22, 2018, which apparently entailed a termination of Hill's position as Associate of the Chancellor and a prohibition from attending events on campus. *Id.* Neither the Board nor UWW warned the campus about Hill's behavior in the intervening ten days. *Id.* On September 14, 2018, Kopper notified campus of Hill's ban. *Id.* at 21. Media outlets and legislative spokespeople questioned UWW's failure to immediately notify the campus of Hill's ban apart from simply taking away his badge. *Id.* On September 19, 2018, UWW commenced a third investigation into Hill. *Id.*

The third investigation, combined with the publicity, led to several more reports about Hill. *Id.* at 23. For example, Jane Does 5 and 6, both employees of UWW, reported unwanted physical contact initiated by Hill and comments laden with sexual innuendo. *Id.* Jane Doe 7, a UWW employee, reported that Hill grabbed her and demanded that she kiss him. *Id.* Jane Doe 10, a UWW employee, reported that Hill told her at a campus event "how good she looked," while simultaneously pulling her close to him and rubbing his penis on her leg, all in front of Kopper. *Id.* at 23–24.

The third investigation concluded that "[t]here is credible evidence that [Hill] sexually harassed employees and students." *Id.* at 25. As a result, Vander Pas dropped out of the MBA program. *Id.* at 27. Vander Pas alleges that she has suffered physical and emotional injuries, including insomnia, low energy, muscle tension, PTSD, and major depressive disorder. *Id.* at 25.

3. **ANALYSIS**

   3.1 **The Board's Motion to Dismiss**

   The Board moves to dismiss all three counts of Vander Pas's Complaint. Vander Pas does not dispute dismissal of Counts Two and Three, which allege violations of the Equal Protection Clause and the Due Process Clause. ECF No. 12 at 2. Accordingly, the Court will grant the Board's motion to dismiss Counts Two and Three. This Order will address only the Board's motion to dismiss Count One, which alleges violations of Title IX of the Education Amendments of 1972 ("Title IX").

   Vander Pas asserts two theories of liability for her Title IX claim. ECF No. 12 at 2. The first is that the Board violated Title IX by "maintaining a general policy of deliberate indifference to reports of sexual harassment, which increased the risk that [Vander Pas] would be assaulted." *Id.* (citing ECF No. 1 at ¶¶ 158–64, 174, 186, 190–91). The second is that the Board violated Title IX by "failing to adequately respond to [Vander Pas's allegations of] sexual harassment and the sexual harassment of other students and employees." *Id.* (citing ECF No. 1 at ¶¶ 64, 98, 107, 120, 125–26, 167, 184). Vander Pas refers to the two theories as (1) a pre-assault claim and (2) a post-assault claim. *Id.* The Board refers to the two theories as (1) an official policy claim and (2) a post-assault claim. ECF No. 14 at 9.

   The Seventh Circuit has yet to adjudicate a "pre-assault" or "official policy" claim under Title IX. The claim derives from Supreme Court dicta, sister Circuit holdings, lower court holdings, and U.S. Department of Education guidance. ECF No. 12 at 4–5, 11–12; ECF No. 14 at 8–15. As set forth in the body of this Order, the Court will follow this persuasive precedent and guidance. In the absence of guidance from the Seventh Circuit or the Supreme Court, the Court will recognize an "official policy"

claim as a distinct, cognizable theory of liability under Title IX. *See Reed v. S. Ill. Univ.*, No. 18-CV-1968, 2020 WL 3077186, at *7 (S.D. Ill. June 10, 2020) ("While the issue has not been addressed in the Seventh Circuit, that alone is insufficient to lead this Court to rule definitively that such a claim does not exist or has been rejected or not recognized in this Circuit.").

The Court will address each of Vander Pas's Title IX theories of liability, (1) official policy and (2) post-assault, in turn.

### 3.1.1 Title IX – Official Policy Claim

To state a Title IX official policy claim, a plaintiff must allege that

> (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school."

*Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020) (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). The Board's argument rests upon the first element: that Vander Pas's allegations "fail to add up to an 'official policy'" of deliberate indifference. ECF No. 14 at 8–15. The Board argues that Vander Pas fails to allege an official policy because: (1) Vander Pas's factual allegations do not support an "unwritten custom, practice and policy," as the Seventh Circuit has considered in analogous Section 1983 *Monell*[2] claims; and (2) Vander Pas's factual allegations "fail to stack up" against the Tenth and Ninth Circuits' hallmark "official policy" cases. *Id.*

---

[2]*Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

The Court first addresses the Board's argument regarding analogous Section 1983 *Monell* case law. The U.S. Supreme Court, in adopting a deliberate indifference standard for Title IX post-assault claims, stated that "[c]omparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998). Accordingly, when the Tenth Circuit first recognized a Title IX official policy claim, it turned to *Monell* for guidance. *Simpson v. Univ. of Colo.*, 500 F.3d 1170, 1177–78 (10th Cir. 2007) (quoting *Monell*, 436 U.S. at 694).

In the absence of guidance from the Seventh Circuit on Title IX official policy claims, the Court so too turns to Seventh Circuit and U.S. Supreme Court precedent adjudicating Section 1983 *Monell* claims. The Seventh Circuit has held that an official policy for *Monell* claims may be a "widespread, though unwritten, custom or practice." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). A failure to act, where it "reflects a 'deliberate' or 'conscious' choice," may constitute such a policy. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). A policy will rarely be deliberately indifferent on its face. Where a policy is facially lawful but a plaintiff seeks to demonstrate that "it is the *application* of such policy that results in a constitutional violation," she must plead "a series of bad acts[,] creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020) (emphasis added). Vander Pas has done so here.

The Board refers the Court to *McCauley v. City of Chicago*, where the court affirmed dismissal of a *Monell* claim because the plaintiff did not plead any facts supporting an unwritten custom or policy, stating merely

that "the City has an unwritten custom, practice and policy to afford lesser protection or none at all to victims of domestic violence." 671 F.3d 611, 617 (7th Cir. 2011). That is not the case here. The Court need not restate all of the relevant facts, *see supra* Section 2, but instead notes the following.

First, Vander Pas pleads at least four examples of UWW's mishandling of sexual assault and/or harassment reports, or mandatory reporters failing to report, prior to her harassment and assault: Fader's two reports, Jane Doe 1's report, and Arnold's report to Trampf about Hill.

Moreover, Vander Pas pleads numerous examples of UWW's mishandling of sexual assault and/or harassment reports during her harassment and assault. Kopper observed Hill harass Vander Pas in October of 2015 and did not report it. Barry and Meladonia were aware of Hill's harassment of Jane Doe 3 as early as the fall of 2015 and did not report it. Heidenreich and Kuhl overheard Hill's harassment of Jane Doe 2 in August of 2016 and did not report it. Vander Pas pleads the facts surrounding Jane Doe 3's complaint to Wesley, and Smith's subsequent statement to Hill to "watch his actions." Brokenburr ordered that Hill be counseled on sexual harassment in or around 2017, but UWW did not ensure that the counseling was completed. UWW permitted Hill to be exempted from mandatory harassment training. In 2018, Smith told Jane Doe 4 when she complained about Hill that, "If it's any consolation, you aren't the only one." All of these individuals were mandatory reporters under UWW's policy. Vander Pas also pleads the results of *three* investigations into Hill, and his ultimate ban from campus.

Additionally, Vander Pas also pleads that following her assault and harassment, UWW did not inform the campus of Hill's ban until three months after it took place; nor did UWW warn students in the time between

the second investigation and Hill's ban. UWW is now undergoing a DOE investigation based on its mishandling of sexual assault and/or harassment complaints.

"[A] plaintiff's Title IX pre-assault claim accrues when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment." *Karasek v. Regents of Univ. of Cal.*, 500 F. Supp. 3d 967, 978 (N.D. Cal. 2020). This is because a plaintiff must be on notice "not just of the concrete injury[,] but of its 'cause.'" *Id.* at 979. Because the claim accrues when the plaintiff learns not just of the injury but also of its cause, a Title IX official policy claim will stand even if the alleged policy of deliberate indifference is uncovered *after* the assault. This is because "[t]he 'cause' for purposes of a[n official policy] action against a university is the school's alleged policy, not just the assault itself." *Id.* at 979 (holding that Title IX official policy claim for assaults that occurred in 2012 accrued when audit revealed deficient policy in 2014) (citing for support *Two Rivers v. Lewis*, 174 F.3d 987, 992 (9th Cir. 1999) (Section 1983 claim accrued when the plaintiff "knew or had reason to know of the . . . employees' deliberate indifference to his medical needs")).

The facts prior to Vander Pas's assault are sufficient to state a claim that UWW had an unwritten custom or policy of deliberate indifference towards sexual assault and/or harassment complaints. Even if they were not, applying *Karasek*, Vander Pas states a Title IX official policy claim based on the facts regarding UWW's unwritten custom or policy during her harassment and after her assault. The reasoning in *Karasek* is supported by the Seventh Circuit's holding (analogous to the Ninth Circuit's in *Two Rivers*, *supra*) regarding accrual of Section 1983 claims. *Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2013) ("A § 1983 claim to redress a medical injury

arising from deliberate indifference to a prisoner's serious medical needs accrues when the plaintiff knows of his physical injury and its cause.").

The Board's argument that Vander Pas's allegations regarding UWW's policy do not rise to the level of the official policies in the hallmark Tenth and Ninth Circuit "official policy" cases is similarly unavailing. The Board distinguishes the Tenth Circuit's holding in *Simpson* by pointing to the fact that, there, the university "sanctioned, supported, [and] even funded" one specific football recruiting program designed to show young male recruits "a good time." 500 F.3d at 1178. In *Karasek*, however, the Ninth Circuit reviewed the Tenth Circuit's holding in *Simpson* and held that, while

> it may be easier to establish a causal link between a school's policy of deliberate indifference and the plaintiff's harassment when the heightened risk of harassment exists in a specific program . . . . [W]e will not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus.

*Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1113 (9th Cir. 2020).

The Board distinguishes *Karasek* on the basis that, there, the official policy was uncovered after a comprehensive state audit that found that the university mishandled approximately 76% of Title IX complaints. ECF No. 14 at 14 (citing *Karasek*, 500 F. Supp. 2d at 974–75). The Board also notes that the university's Title IX coordinator "was on record" saying that the university's informal Title IX process was inappropriate. *Id.* The Board argues that Vander Pas's allegations regarding UWW's policy lack the overarching "tie" that the audit provided in *Karasek*. *Id.*

In *Karasek*, however, it was not the existence of the audit itself that was dispositive, but rather the audit's individual findings. The audit found

commentary by the Title IX coordinator that supported a faulty policy, that Title IX investigations were untimely and students did not receive updates, that the university failed to educate the campus on sexual misconduct, and that sexual misconduct mandatory reporters acted inadequately. 500 F. Supp. 2d at 984–85. "As a result" of all of these facts, "the Audit found that complaints had been mishandled and students' safety had been placed at risk." *Id.* at 985. The court held that, "[t]aking all of these allegations as true, they are sufficient to show that the University maintained a de facto policy of deliberate indifference toward sexual misconduct on campus. This is not to say, of course, that the University did maintain such a policy; I conclude only that the plaintiffs have plausibly claimed that it did." *Id.*

So too is the Court's decision here. Vander Pas alleges that Smith, the Title IX coordinator, told complainants that they were not alone. UWW's Title IX proceedings did not include a review of all relevant evidence, nor did misconduct investigations follow written UWW policy. Hill was given an exemption from sexual harassment training, and multiple mandatory reporters—including two who allegedly knew of misconduct by Hill prior to Vander Pas's assault—failed to report. *See id.* at 990 (plaintiff pleads causation where the same assailant had already been reported). Vander Pas has sufficiently stated a Title IX "official policy" claim.

### 3.1.2   Title IX – Post-Assault Claim

To state a Title IX post-assault claim, a plaintiff must allege that the defendant educational institution "(1) is a recipient of federal funding, and (2) acted with deliberate indifference (3) to known (4) acts of sexual harassment." *Albiez v. Kaminski*, No. 09-C-1127, 2011 WL 13157185, *7 (E.D. Wis. Dec. 28, 2011). The parties' dispute as to Hill's conduct prior to May of 2017 is centered around the third and fourth elements. The parties' dispute

as to Hill's conduct after May of 2017 is centered around the second element. This is because the Board concedes that it "plausibly had actual knowledge" of Hill's misconduct beginning in May of 2017 when Jane Doe 3 met with Wesley. ECF No. 10 at 14–15.

### 3.1.2.1   Elements Three and Four

As to the third element, the parties agree that the recipient's knowledge need not be of misconduct towards the plaintiff; it may be of misconduct towards others by the same person that ultimately harms the plaintiff. ECF No. 10 at 12 (citing *Hansen v. Bd. of Tr. of Hamilton SE Sch. Corp.*, 551 F.3d 599, 606–07 (7th Cir. 2008)); ECF No. 12 at 13–14. The Board allows that officials have the requisite knowledge of misconduct regarding "incidents that they witness or that have been reported to them." ECF No. 10 at 13 (quoting *Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014)).

The Board argues, however, that absent allegations of knowledge by "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures," a post-assault claim will not lie. ECF No. 10 at 13 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). The Board maintains that the incidents prior to May of 2017 are insufficient to satisfy the *Gebser* actual knowledge standard because Vander Pas does not allege that the mandatory reporters she names had the ability to institute corrective measures. *Id.* at 15–17. Vander Pas responds that this lack of precision is not detrimental to her claims. ECF No. 12 at 17. She argues that it is "reasonable to infer from a job title whether an employee had authority . . . to institute corrective measures." *Id.*

The Court agrees. At a minimum, it is reasonable to infer that a member of Kopper's cabinet, UWW's Director of Human Resources, and Kopper herself had the ability to institute corrective measures. Vander Pas

Case 2:21-cv-01148-JPS   Filed 05/19/22   Page 16 of 23   Document 18

alleges that Arnold witnessed misconduct by Hill and reported it to Trampf. Kopper witnessed Hill rub his penis on Jane Doe 10's leg. Kopper also witnessed Hill touch and wink at Vander Pas in October of 2015. At this stage, where the Court must "draw all reasonable inferences in favor of the plaintiff," the Court infers that these individuals had the authority to institute corrective measures. *Kubiak*, 810 F.3d at 480–81.

It may be revealed in discovery that these individuals did not, in fact, have the requisite authority. It may too be revealed that other individuals named as mandatory reporters with knowledge of Hill's conduct during Vander Pas's harassment in the fall of 2015 and in 2016 did have such authority. Discovery may also reveal the timeline of these incidents and whether the incidents without specific dates occurred prior to Vander Pas's assault in October of 2015, during her harassment, or afterwards.

As to the fourth element, discovery may also reveal whether these individuals believed what they witnessed was actionable, or whether, as the Board argues, these incidents did not give rise to an "obvious risk that Hill would commit actionable discrimination against [Vander Pas]." ECF No. 14 at 4. Contrary to the Board's request, the Court will not weigh whether the alleged conduct is more or less indicative of such a risk than in other cases. That request is an issue of fact that is inappropriate at the pleadings stage. This is bolstered by the fact that the Board's proffered cases for comparison were decided long after the pleadings stage. ECF No. 14 (citing *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869 (7th Cir. 2012); *J.F.K. v. Troup Cnty. Sch. Dist.*, 678 F.3d 1254 (11th Cir. 2012); *Doe v. Flaherty*, 623 F.3d 577 (8th Cir. 2010)). Vander Pas is not required to prove these issues at this stage; she is required only to adequately plead her claim. She has done so.

Case 2:21-cv-01148-JPS   Filed 05/19/22   Page 17 of 23   Document 18

### 3.1.2.2   Element Two

The parties generally agree that courts consider deliberate indifference, for purposes of a post-assault Title IX claim, to be "an official decision by the recipient not to remedy the violation." ECF No. 10 at 10 (citing *Gebser*, 524 U.S. at 290). As to Hill's conduct after May of 2017, Vander Pas contends that the April 21, 2018 winking and finger gun incident constituted continued harassment of which the Board was deliberately indifferent. ECF No. 12 at 9. The Board responds that this conduct is insufficient to rise to the level of harassment. ECF No. 10 at 18–19. As the Court has already stated, it will not consider issues of fact regarding the severity of alleged incidents at the pleadings stage.

In the alternative, however, Vander Pas argues that Hill's presence on campus and UWW's deliberate indifference towards others' reports after May of 2017 caused her continued vulnerability until Hill's campus ban in June of 2018. Vander Pas argues that UWW is liable for this "post-notice" period because "its deliberate indifference . . . at a minimum, cause[d] students to undergo harassment or ma[de] them liable or vulnerable to it." ECF No. 12 at 14 (quoting *Davis*, 526 U.S. at 649). Vander Pas cites a series of Circuit and District court opinions recognizing such a post-notice "vulnerability" claim. *Id.* at 14–15. The Board distinguishes the cases, arguing that they recognize a university's liability for post-notice vulnerability caused by deliberate indifference where the plaintiff herself reported the harassment. ECF No. 14 at 7–8. Here, the Board's argument goes, Vander Pas never herself reported her assault and harassment; the Board's notice in May of 2017 and thereafter came from others' reports. *Id.*

While the Seventh Circuit has not yet addressed this question head on, the Court finds that the distinction of "who reported" the harassment

or assault, thus giving the university notice, is one with no basis in the law. The Seventh Circuit has already held that

> a school district need not possess actual knowledge of a teacher's acts directed at a *particular plaintiff*, but it must still have actual knowledge of misconduct that would create risks so great that they are almost certain to materialize if nothing is done. Thus, if a teacher had been known to be a "serial harasser," a school district might be found to have actual knowledge of that teacher's misconduct and that students may be at great risk.

*Hansen*, 551 F.3d at 605–06 (internal citations omitted). The Seventh Circuit also addressed a claim for post-notice harassment in *Johnson v. Northeast School Corporation*. There, a student alleged that, had her school conducted a proper investigation, it would have expelled the perpetrator and the student "would not have been subjected to some of the alleged harassment she faced at school." 972 F.3d 905, 912 (7th Cir. 2020). The court addressed this claim on summary judgment, where it determined that the school's post-notice response was not deliberately indifferent, not that the claim was not viable. Deliberate indifference is not the question before the Court today; the question is only whether a plaintiff can state a claim for post-notice harassment where the university's notice came from other students.

The Court determines that such a claim is viable. *See also Doe v. Bd. of Regents of Univ. of Wis.*, No. 20-CV-856-WMC, 2021 WL 5114371, at *3 (W.D. Wis. Nov. 3, 2021) ("[P]laintiff has adequately pleaded actionable harassment on the part of UW by alleging that she was forced to attend school with her perpetrator . . . . a situation that was fully within UW control and which UW had the authority to prevent . . . . At the pleadings stage, this is sufficient."); U.S. Department of Education, *Statement of Interest*, No. 20-CV-3081 (D. Neb. Jan. 14, 2022) ("To plausibly plead deliberate

indifference for a post-assault claim, plaintiffs may allege facts showing either that the school's response (or lack thereof) caused them to undergo further harassment . . . or made them vulnerable to potential further harassment . . . or both.") (citing *Davis*, 526 U.S. at 645).

Vander Pas alleges three investigations into Hill after May of 2017, as well as his ban from campus and termination. Vander Pas was afraid to attend events on campus until she heard that Hill had been banned. She also pleads that she was placed further at risk due to the length of time between the second investigation and Hill's ban. Whether UWW was, indeed, deliberately indifferent so as to create a causal nexus to Vander Pas's feelings of vulnerability is not a question at the pleadings stage. The Court will deny the Board's motion to dismiss Vander Pas's Title IX claim.

### 3.2 Vander Pas's Motion to Amend

Vander Pas moves to amend her Complaint to (1) remove Counts Two and Three, (2) add additional allegations of harassment of Vander Pas by Hill, and (3) add a count for violation of Wis. Stat. § 19.35. ECF No. 15. The Board opposes the motion on the basis that Vander Pas does not state in her motion what the new harassment allegations are, that Vander Pas delayed in pleading the new harassment allegations and that they are futile because she does not explain why they are legally relevant, and that the Court lacks jurisdiction over the Wis. Stat. § 19.35 claim. ECF No. 16.

The Board cites *McIntosh v. Jadin* to support its argument that Vander Pas does not comply with Civil Local Rule 15 because her motion does not state what the new harassment allegations are. No. 09-CV-1106, 2010 WL 5180123 (E.D. Wis. Dec. 15, 2010). But in that case, the court was unable to discern the new allegations because the plaintiff did not attach a proposed amended complaint, nor did he explain the substance of the new allegations

other than stating they "relate back" to the complaint. *Id.* at *1. That is not the case here. Vander Pas attaches a proposed amended complaint and describes the proposed changes with sufficient specificity. The Board was—and is—capable of running a "Compare" between the Complaint and the proposed amended complaint if reading the document does not suffice to discern the new allegations.

The proposed amended complaint adds allegations regarding multiple additional incidents of alleged harassment by Hill of Vander Pas, particularly in the post-May 2017 period. These include additional allegations witnessed by Kopper. The Board spends a significant portion of its dismissal briefing arguing that the allegations during this period are deficient. Thus, the new allegations are clearly legally relevant. This case is in its infancy and remains at the pleadings stage; therefore, the Court does not find undue delay or undue prejudice. Vander Pas also pleads her ongoing efforts to pursue open records requests, which may support why Vander Pas' memory is refreshed, and the allegations are added, now.

Finally, the Court is persuaded that Vander Pas's Wis. Stat. § 19.35 claim "derives from a common nucleus of operative fact" such that it "form[s] part of the same case or controversy" as Vander Pas's Title IX claim. *McCoy v. Iberdola Renewables, Inc.*, 760 F.3d 674, 682–83 (7th Cir. 2014). In January of 2019, Vander Pas alleges that she sent open records requests to UWW, the Board, and the University of Wisconsin System requesting, *inter alia*, documents pertaining to complaints of harassment and/or assault made against Hill. ECF No. 15–1 at 27. Three months later, Vander Pas received a set of heavily redacted records. *Id.* at 28. Vander Pas alleges that the names of report recipients, as well as the dates of the reports, are redacted. *Id.* at 28–32. Vander Pas sent a second request in July of 2019 and

received similar records. *Id.* at 34. Vander Pas continues to pursue the records, including some 6,384 emails that were provided to UWW's investigators. *Id.* at 35.

The basis for Vander Pas's open records requests is her alleged harassment and assault by Hill. Vander Pas contends that the withheld and unredacted records will allow her to understand who else had knowledge of misconduct by Hill and when they gained that knowledge. These facts relate directly to and arise from Vander Pas's Title IX claim. The Court determines that it has supplemental jurisdiction over Vander Pas's Wis. Stat. § 19.35 claim under 28 U.S.C. § 1367(a) and will grant Vander Pas's motion to amend her Complaint.

4. **CONCLUSION**

The Court grants the Board's motion to dismiss Counts Two and Three. The Court denies the Board's motion to dismiss Count One. ECF No. 9. The Court grants Vander Pas's motion to amend. ECF No. 15.

Accordingly,

**IT IS ORDERED** that the Board's motion to dismiss for failure to state a claim, ECF No. 9, be and the same is hereby **GRANTED in part** and **DENIED in part**;

**IT IS FURTHER ORDERED** that Counts Two and Three of Vander Pas's Complaint, ECF No. 1 at 27–29, be and the same are hereby **DISMISSED without prejudice**;

**IT IS FURTHER ORDERED** that Vander Pas's motion to amend her Complaint, ECF No. 15, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to docket the proposed Amended Complaint filed as ECF No. 15–1 as Vander Pas's Amended Complaint.

Dated at Milwaukee, Wisconsin, this 19th day of May, 2022.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge