# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

STEPHANIE GOETTL VANDER PAS,

                Plaintiff,

v.

                                    Case No. 21-CV-1148-JPS

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN
SYSTEM,

                                    **ORDER**

                Defendant.

This case comes before the Court on (1) Defendant Board of Regents of the University of Wisconsin System's (the "Board") January 30, 2023 motion to compel discovery, to stay case deadlines, and for sanctions against Plaintiff Stephanie Goettl Vander Pas ("Vander Pas"), ECF No. 31; and (2) the Board's February 8, 2023 motion to amend its answer, ECF No. 36. Both motions are fully briefed. ECF Nos. 33, 56, 61; ECF Nos. 36, 58, 62. For the reasons set forth herein, the Court grants the Board's motion to compel and for sanctions and enters the sanction of dismissal of the action with prejudice, as well as payment by Vander Pas's counsel of the Board's reasonable costs and fees to file the motion. As a result, the Court denies as moot the Board's motion to stay and motion to amend its answer.[1]

---

[1]The Court will not entertain the Board's most recent motion, ostensibly filed under Federal Rule of Civil Procedure 83. ECF No. 64. As the Court's pretrial order explains, Rule 1 teaches that the Rules "should be construed, administered, and employed by the court *and the parties* to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added). In accordance with the obligations set forth in Rule 1, "[a] court has inherent authority to manage its docket." *Miller v. Wolpoff & Abrahmson, LLP,*

1. **RELEVANT FACTS & ARGUMENTS**

Vander Pas brings official policy and post-assault claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), related to allegations of harassing and assaultive behavior by a former University of Wisconsin-Whitewater ("UWW") employee, Pete Hill ("Hill"), who was also the husband of the UWW chancellor at the time of Vander Pas's attendance at UWW. ECF No. 20. Vander Pas also raises a supplemental state law claim under Wis. Stat. § 19.35. *Id.*

Vander Pas's amended complaint pleads allegations related to harassing and assaultive behavior by Hill towards Vander Pas herself beginning in December 2012 through April 2018, including an assault that took place in October 2015. *Id.* Vander Pas was a UWW undergraduate from the fall of 2009 through the spring of 2013, and a UWW Master of Business Administration ("MBA") student from the fall of 2015 through January 2018, when she left the MBA program. *Id.*; ECF No. 33 at 1. As a result of Hill's behavior, Vander Pas alleges that she suffers "severe physical and emotional injuries," and has been diagnosed with post-traumatic stress disorder and major depressive disorder, which require ongoing medical treatment. ECF No. 20 at 27.

The remainder of this section chronicles the facts underlying the spoliation, perjury, withholding of discovery, and failure to investigate

---

309 Fed. App'x 40, 42 (7th Cir. 2009). "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (internal citation omitted). The termination of this case will ultimately render moot the Board's newest motion, and the Court will not otherwise engage with it.

disputes currently before the Court, as well as the parties' arguments surrounding those disputes.

### 1.1 Vander Pas's Journals and Internet Blogs

Discovery has revealed that from January 2018 through May 2020, Vander Pas blogged online about living with Ehlers-Danlos Syndrome ("EDS"), a rare, painful, and incurable disease. ECF No. 33 at 1. Vander Pas was diagnosed with EDS in August 2016. *Id.* at 9. Vander Pas wrote in a January 23, 2018 blog post about EDS that she dropped out of her MBA program because "with all the pain, [she] didn't think [she] could handle attending school." *Id.* at 2. Similar blog posts from June 2018 and January 2019 describe Vander Pas's decisions to take employment leave due to physical pain related to EDS. *Id.* In a January 23, 2018 blog post about EDS, Vander Pas wrote that "journaling is a great way to release how you're feeling. You may not be able to make your pain go away, but releasing how you feel emotionally about pain is always a good idea . . . . I regularly journal and doodle my thoughts about what I'm going through." *Id.* at 2–3.

The Board requested all of Vander Pas's "journals, notes, diaries, blogs, or other documents or correspondence" in her possession, custody, or control "that have any reference to the allegations in this lawsuit and/or the injuries or damages you claim you have sustained." *Id.* at 12. Vander Pas's first document production was dated October 26, 2022, and referenced a journal. Vander Pas and/or her counsel did not at that time produce any journal to the Board. *See id.* Because of the reference in the first document production, the Board followed up on the journal and received it in a December 8, 2022 supplemental production; the earliest produced journal entry was dated December 16, 2021. *Id.* Vander Pas's December 8, 2022 supplemental production contained a journal entry dated September 30,

2022 that detailed Vander Pas's frustration regarding discovery requests for her journal. *Id.*

Vander Pas testified at her deposition that she did not begin journaling until December 16, 2021, which is when she entered a treatment program. *Id.* at 12–13. After the Board showed her the January 23, 2018 blog post described above, Vander Pas testified at her deposition that the blog post was true only as to "pain journaling." *Id.* at 13. To date, Vander Pas has not produced any journal entries dated prior to December 16, 2021. *Id.*

In their briefing, Vander Pas's counsel refers to the "pain journals" (which is how Vander Pas referred to them at her deposition) instead as "pain logs." *See generally* ECF No. 56.[2] Counsel contends that the pain journals are not traditional journals. *Id.* at 6. More to the point, counsel maintains that the pain journals are not responsive because they do not refer to any allegations, injuries, or damages in this action. *Id.* As a result, counsel argues that Vander Pas did not lie at her deposition when she testified that she first journaled on December 16, 2021, and that Vander Pas clearly testified that such "traditional journaling" was different from pain journaling. *Id.* at 9. Counsel cites to Vander Pas's testimony affirming that the December 16, 2021 journal entry was her first journal entry and that her pain journals "certainly [weren't] journaling." *Id.* at 10; *see also* ECF No. 30-1 at 272–73.

---

[2] As explained further below, the Court finds counsel's use of the term "pain logs" a further effort to use semantics to obscure their discovery violations. *See infra* Section 2. Therefore, the Court uses Vander Pas's terminology of "pain journals" for the remainder of this Order.

### 1.2 Vander Pas's Text Messages

The Board requested that Vander Pas identify each text message and/or instant message service upon which she received or transmitted any information related to her claims, injuries, and/or damages. ECF No. 33 at 22. Vander Pas responded that she uses Facebook Messenger and U.S. Cellular; her employer, D.L.K. Enterprises, Inc., is the U.S. Cellular account holder. *Id.*

The Board also requested that Vander Pas produce her text messages related to her claims, injuries, and/or damages. *Id.*; ECF No. 32-4 at 11–12. At her deposition, Vander Pas testified that she no longer has many relevant text messages because her "messages were set to delete after 30 days," given that her phone is a work phone. ECF No. 30-1 at 9. Vander Pas explained that she was trying to work with her carrier to obtain the deleted messages. *Id.* at 10. The Board is concerned because Vander Pas produced journal entries during discovery in which she expressed fear regarding her text messages being read. ECF No. 33 at 9. The Board is also concerned because Vander Pas testified that she knew for "some time" that her phone was set to automatically delete text messages every 30 days, but she did not disable that feature until the Board requested discovery in late 2022 or, in her words, "very recently." ECF No. 30-1 at 275. Vander Pas testified that she has been able to easily disable the feature in the past. *Id.*

The Board is also concerned with respect to a Facebook message that was produced following Vander Pas's deposition, in which Vander Pas wrote in November 2018 that she had texted her friend and employer, Mike Kachel ("Kachel"), in August 2018 about her plans to "file a complaint" regarding Hill. ECF No. 33 at 23. At her deposition, Vander Pas testified,

contrary to this message, that she had never exchanged any messages with Kachel related to the October 2015 assault by Hill. ECF No. 30-1 at 60–61.

In response, Vander Pas's counsel explains that the texts were not *intentionally* deleted because of the automatic deletion function. ECF No. 56 at 24. Specifically, "[t]he suggestion that Stephanie intentionally deleted text messages when she produced over . . . 1,500 pages of private, intimate, and sometimes embarrassing details of her life," including of her sex life, "is preposterous." *Id.* at 24–25. As to the Board's contentions regarding Kachel, counsel explains that the August 2018 "complaint filing" plans to which Vander Pas referred meant that she intended to come forward publicly regarding Hill, not to file a legal complaint. *Id.* at 25. Vander Pas texted Kachel in advance because she was concerned that her public disclosure would affect Kachel, who was affiliated with the foundation that provided her with her scholarship. *Id.* Counsel also argues that, specifically as to the August 2018 text to Kachel, Vander Pas's duty to preserve had not yet set in. *Id.* at 26. Finally, counsel contends that the Board has not established that the text messages are permanently deleted; for example, the Board has not attempted to retrieve the text messages directly from Kachel. *Id.* at 27.

### 1.3    Vander Pas's Social Media Data

The Board requested that Vander Pas identify all of her social media accounts and produce all relevant electronically stored information ("ESI") for those accounts. ECF No. 33 at 16. Vander Pas identified her Facebook and Instagram accounts, as well as her EDS blog. *Id.* Vander Pas's first document production included 35 pages of Facebook posts and messages, but no Instagram posts or messages or EDS blog posts. *Id.* After a December 27, 2022 meet-and-confer, Vander Pas's counsel informed the Board that

Vander Pas had no additional documents responsive to these requests. *Id.* at 17. Vander Pas's counsel confirmed the same on December 29, 2022, and affirmatively stated that Vander Pas was not objecting to the Board's discovery requests on relevance grounds. *Id.* According to the Board, Vander Pas's counsel's failure to object as to relevance—or lodge any of her current objections—in a timely manner, means those objections are waived. ECF No. 61 at 2.

Thereafter, on January 3, 2023, Vander Pas's counsel produced a supplemental 56-page production of Facebook posts and messages. ECF No. 33 at 17. During her deposition, Vander Pas testified that she had downloaded all of her Facebook data and given it to her counsel; however, at that time, only 91 pages of Facebook posts and messages had been produced. *Id.* No Instagram posts had been produced. *Id.* at 18. The Board located and showed Vander Pas a relevant Instagram post during her deposition, after which Vander Pas and her counsel agreed to supplement the production with all relevant Instagram posts. *Id.* at 18.

After her deposition, on January 20, 2023, Vander Pas identified additional, previously undisclosed social media accounts, and produced another 195-page PDF of social media posts and photographs, as well as six videos. *Id.* The previously undisclosed social media accounts contain responsive posts. ECF No. 61 at 12. Five days later, Vander Pas produced a 978-page PDF of heavily redacted Facebook posts, with no metadata or privilege log, and three pages of Instagram comments. ECF No. 33 at 19. None of the social media data produced to date predates the fall of 2018. *Id.*

One of the produced Facebook messages from fall of 2018 shows Vander Pas writing that "it's not easy to get a job while disabled." *Id.* at 20. Another, which was not produced until after the Board's motion to compel

was filed, shows Vander Pas writing in December 2018 that, because the former chancellor had resigned, she believes she could finish the MBA program. ECF No. 61 at 11. Also in the production served after the motion to compel are emails, notes, and journals sent to Vander Pas's counsel from other women who were allegedly harassed by Hill, and which had not previously been produced. *Id.*

Further, the Board requested that Vander Pas produce all online comments that she alleges were critical of her decision to report Hill's harassment. ECF No. 33 at 24. The request was based on Vander Pas's expert report regarding the effect the comments had on Vander Pas's mental health. *Id.* At her deposition, however, Vander Pas testified that either she or her husband deleted some of the comments; specifically, those comments that were threatening. ECF No. 30-1 at 112, 134–35. The comments were never produced. ECF No. 33 at 24. Vander Pas testified that she believes the Facebook data no longer contains the deleted comments. *Id.* at 112–13.

Vander Pas's counsel responds that the Board's document requests as to social media data, and particularly Facebook data, are "unsupervised and unlimited," particularly because they lack a date range. ECF No. 56 at 14 (citing cases). Counsel explains that Vander Pas downloaded all of her Facebook data, which took numerous days, and included no messages, comments, or posts. *Id.* at 16–17. In an attempt to avoid producing irrelevant data and to increase the likelihood of a successful download, counsel instructed Vander Pas to limit her Facebook download to four date ranges: (1) September 10, 2018 to November 30, 2018, as Vander Pas came forward publicly regarding Hill's conduct on September 14, 2018; (2) December 17, 2018 to December 19, 2018, as the former chancellor announced her

resignation on December 17, 2018; (3) April 19, 2019 to April 25, 2019, as the results of an investigation into Hill were released to the media on April 19, 2019; and (4) October 21, 2015 to October 29, 2015, as Vander Pas's sexual assault by Hill occurred on October 21, 2015. *Id.* at 17–18.

Counsel avers that reviewing the first category of Facebook data (the data from September 10, 2018 to November 30, 2018) took 25.50 hours of attorney time and estimates that reviewing all of the Facebook data from 2012 to the present would take an additional 1,281 hours of attorney time. *Id.* at 21 & n.6. Counsel also explains that 1,480 pages of social media posts have been produced, and that the Board's assertion that no Instagram posts had been produced prior to Vander Pas's deposition is untruthful. *Id.* & n.7. The Board counters that, despite four meet-and-confer letters, multiple emails, a meet-and-confer conference, and extensive questioning on discovery obligations during Vander Pas's deposition, Vander Pas's counsel never conferred with the Board regarding these search limitations. ECF No. 61 at 4.

Finally, Vander Pas's counsel explains that, following the December 29, 2022 meet-and-confer, they undertook efforts to locate publicly available derogatory comments about Vander Pas, understanding this conversation to reflect an attempt by the Board "to narrow its previously extremely broad request for the entirety of Stephanie's Facebook data." ECF No. 56 at 19. As to the Board's contentions regarding the deleted Facebook comments, Vander Pas's counsel argues that, at the time the comments were deleted in late 2018, Vander Pas was not yet under a duty to preserve. *Id.* at 28. Moreover, the comments—which threatened and objectified Vander Pas— were not deleted in bad faith; counsel contends that Vander Pas deleted them in order to protect herself. *Id.* at 29. Vander Pas avers that she deleted

them because she did not want them to be her legacy. *Id.* Counsel does not respond regarding the alleged heavy redactions to the Facebook data.

### 1.4    Vander Pas's Emails

The Board requested all of Vander Pas's relevant email correspondence. ECF No. 33 at 20. At the time the instant motion was filed, Vander Pas had produced only one email. *Id.* At her deposition, Vander Pas testified that she had sent and received relevant emails from her Whitewater city council email address, including to and from members of the press, but had not obtained them and did not have them in her possession. *Id.* Vander Pas agreed to try to obtain them. *Id.*; *see also* ECF No. 30-1 at 160. They have not yet been produced.

In response, Vander Pas's counsel explains that Vander Pas was a member of the Whitewater city council from November 2011 to November 2018. ECF No. 56 at 21. Vander Pas lost access to her city email account when she resigned from the position. *Id.* Therefore, she should not be required to produce the emails herself because they are not in her possession, custody, or control. *Id.* at 21–22. Moreover, they are a matter of public record and easily obtainable through other means. *Id.*

### 1.5    Vander Pas's Medical Records

The Board requested Vander Pas's "psychiatric, psychological, mental, behavioral, or emotional health treatment" records from the date she first received mental health treatment, as well as records relating to medical diagnoses received beginning from when Vander Pas enrolled at UWW as an undergraduate in 2009. ECF No. 33 at 9; ECF No. 32-4 at 7–8. The earliest medical record in Vander Pas's first production was dated October 4, 2018. ECF No. 33 at 10. The production did not include any records examined by, relied upon, or authored by Vander Pas's expert

witness, as requested. *Id.* After an initial meet-and-confer, Vander Pas's counsel supplemented the production with medical records; this time, the earliest record was dated July 19, 2019. *Id.* After a third meet-and-confer, Vander Pas's counsel supplemented her production again, and included records dating back to January 2017. *Id.* at 11.

During a fourth meet-and-confer on December 29, 2022, the parties agreed that Vander Pas would sign authorizations for the release of her medical records. *Id.* After several conferral emails and letters, including a January 12, 2023 letter where the Board stated that it understood that Vander Pas would send signed authorizations to the Board, as of the time of the filing of the motion on January 30, 2023, Vander Pas had not sent any signed authorizations to the Board. *Id.*

In response, Vander Pas's counsel argues that the relevant document request does not include dates and merely references underlying interrogatories, which themselves include dates. ECF No. 56 at 3. Counsel also explains that Vander Pas produced records for all five of her mental health treatment providers, and physical treatment records initially dating back to October 4, 2018, and later back to January 2017. *Id.* at 3–4. Counsel notes that during the December 29, 2022 meet-and-confer, the parties discussed the expert report issue as well as the lack of authorizations. *Id.* at 4. Counsel was "surprised" by the Board's accusations, but stated that Vander Pas would sign authorizations. *Id.*

Counsel attributes the delay in sending authorizations to their apparent understanding that the Board would provide proposed authorizations for Vander Pas to sign. *Id.* at 5. The authorizations Vander Pas ultimately provided allowed for disclosure of Vander Pas's health

information from the University of Wisconsin Hospitals and Clinics from January 1, 2012 through the present. *Id.* at 5.

These records reflect only those providers that Vander Pas saw from Vander Pas's identified date of diagnosis—October 4, 2018—through the present. ECF No. 61 at 6. As with the social media data, the Board contends that Vander Pas's counsel never conferred with it regarding these limitations on the production of medical records. *Id.* at 4. Moreover, the Board argues that Vander Pas's produced medical records show that she was receiving treatment for mental health issues prior to October 4, 2018, indicating that this date of diagnosis is incorrect. *Id.* at 5. Additionally, the same records show that Vander Pas has received 23 medical diagnoses, while she only disclosed two in discovery. *Id.* at 7. The Board also alleges prejudice because the authorizations were not provided until the day after the expert disclosure deadline. *Id.* at 7.

### 1.6    Vander Pas's Job Applications

The Board requested identification and production of all employment applications that Vander Pas submitted from September 1, 2017 through the present. ECF No. 33 at 14. Vander Pas responded to the interrogatory portion of the request that she had submitted several responsive job applications. *Id.* At her deposition, she testified that she sent files relating to roughly 60 positions for which she had applied to her counsel in late October or early November 2022. *Id.*  at 15. The Board contends that it did not receive these files until January 20, 2023. *Id.* The Board further asserts that what it did receive is incomplete; for example, many job applications are missing. *Id.* at 15–16.

In response, Vander Pas's counsel explains that any incompleteness in the job application productions was due to counsel error. ECF No. 56 at

Case 2:21-cv-01148-JPS   Filed 03/27/23   Page 12 of 32   Document 67

11. Specifically, Vander Pas provided all job application data to her counsel; that data was withheld from production while counsel reviewed it. *Id.* at 11–12. In October 2022, counsel Bates-stamped the documents for production, but inadvertently placed them in the wrong folder, which led to their late production in January 2023. *Id.* at 12–13. Counsel also avers that the deficiency was not brought to their attention until Vander Pas's deposition. *Id.* at 13. Counsel claims their error is evidenced by the fact that the production was referenced by Bates number in correspondence after October 2022 but before January 2023, indicating that it had, in fact, been stamped, but had simply not been produced. *Id.* at 12. Finally, counsel explains that, with respect to the allegedly missing job applications, Vander Pas had merely uploaded her resume for those job applications with one click on Indeed, and submitted no further application materials. *Id.* at 14.

## 2. ANALYSIS

### 2.1 Spoliation

A court may impose sanctions for spoliation under Federal Rule of Civil Procedure 37 or under its own inherent power. *See, e.g.*, *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005), *aff'd*, 200 F. App'x 592 (7th Cir. 2006). Assessing whether spoliation has occurred requires a two-step analysis. First, a finding of spoliation lies "only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." *Trask–Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008). Second, under the express terms of Rule 37(e)(2), once a party is under a duty to preserve evidence, they may only be subject to spoliation sanctions when they intentionally destroy that evidence in bad faith. *Bracey v. Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013). Bad-faith destruction occurs when a party destroys evidence "for the

purpose of hiding adverse information." *Id.* at 1019 (quotation omitted); *see also Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002) ("[T]he crucial element is not that evidence was destroyed but rather the reason for the destruction.").

"[I]n cases involving ESI, to satisfy their preservation duties, parties must investigate and disable autodelete functions on email accounts . . . at the onset of the litigation" or "once litigation is reasonably anticipated." *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 931–33 (N.D. Ill. 2021). Rule 37(e) codifies the requirement to disable autodelete features. *Id.* (citing Fed. R. Civ. P. 37(e) advisory committee's notes to 2006 & 2015 amendments).

"Federal courts across the country have recognized that a plaintiff's duty to preserve is more often triggered before litigation commences, in large part because plaintiffs control the timing of the litigation." *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350, 354 (N.D. Ill. 2016). Therefore, in this case, the Court will assess when litigation was reasonably anticipated, rather than looking only to the date of the onset of the litigation. To determine when litigation is reasonably anticipated, "courts consider a variety of factors, including the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the course of conduct between the parties . . . , and what steps both parties took after the incident and before the loss of the evidence." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 468 (E.D. Pa. 2020). Courts apply this standard to lay and sophisticated plaintiffs alike. *See, e.g., Cohn*, 318 F.R.D. at 352, 354.

The record is unclear as to when Vander Pas first began to search for an attorney. However, like in *Cohn*, Vander Pas began making explicit references to legal action well before she filed her complaint. 318 F.R.D. at

354. The Court determines that Vander Pas reasonably anticipated litigation in August 2018 when she texted Kachel that she intended to file a complaint regarding Hill's conduct. The fact that she used the word "file" and not "make" or "report" evinces an intent to pursue legal claims, despite Vander Pas's counsel's arguments to the contrary. Indeed, Vander Pas thereafter came forward publicly regarding Hill in September 2018, further indicating her intent to carry on towards litigation. As courts instruct, "the course of conduct between the parties" and the "steps" parties take after the subject incident are telling as to when reasonable anticipation of litigation began. *Bistrian*, 448 F. Supp. 3d at 468. Therefore, Vander Pas's duty to preserve all relevant evidence—be that her text messages, her Facebook comments, or the like—commenced in August 2018. The intentionally deleted Facebook comments and the autodeleted text messages from that point forward should have been preserved. Nonetheless, Vander Pas intentionally deleted Facebook comments in late 2018, and did not disable the autodelete function on her cell phone until a year after she filed her complaint.

While Vander Pas alone is to blame for the Facebook comments she intentionally deleted, her counsel shares the blame for the autodeleted text messages. *See DR Distributors, LLC*, 513 F. Supp. 3d at 931 (explaining the "phalanx of publications warning litigators of the need to clearly and adequately inform their clients to investigate and turn off autodelete functions as part of their litigation hold processes"). Autodelete features are now nearly ubiquitous in ESI-producing and storage devices, like Vander Pas's cell phone. *Id.* at 931. Some courts hold that informing a client of preservation obligations is insufficient; counsel must "take affirmative steps to monitor compliance." *Id.* at 933 (quoting Lisa C. Wood & Matthew

E. Miller, *What You and Your Client Can and Should Do to Avoid Spoliation of Electronic Evidence*, 27 Antitrust ABA 85, 86 (Summer 2013)).

In the same vein, counsel should be wary of permitting clients to self-collect their ESI. *Id.* at 935. Self-collection leads to several issues. First, clients fail to disclose all relevant information or fail to disable autodelete features. *Id.* Second, clients may omit relevant documents from collections before providing them to counsel, particularly if they have a stake in the outcome of the case. *Id.* Third, clients likely will not document how they conducted their searches. *Id.* All of these pitfalls lead to a "trickling production of documents," which ultimately demonstrates an utter failure by counsel "to conduct the thorough search for documents required by" Rule 34. *Id.* (citing *Bd. of Regents of the Univ. of Neb. v. BASF Corp.*, No. 04 CV 3356, 2007 WL 33423, at *5–6 (D. Nev. Nov. 5, 2007)).

The failure to take reasonable steps to preserve ESI goes to the intent prong of the spoliation analysis. *Id.* at 979–80. In her affidavit, Vander Pas avers that she deleted the Facebook comments to survive, not because she sought to hide adverse information. In the Court's view, this conduct amounts to gross negligence, but not bad faith. *See, e.g.*, *Jones v. Bremen High Sch. Dist. 228*, No. 08-C-3548, 2010 WL 2106640, at *6 (N.D. Ill. May 25, 2010) (citing *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (1992) (explaining that gross negligence includes poor judgment as to discovery obligations, and failure to timely inform the other side of the same by standing "idly by for months")). Whether the spoliated evidence is recoverable is also a salient factor. *DR Distributors*, 513 F. Supp. 3d at 980; Fed. R. Civ. P. 37(e), advisory committee's notes to 2015 amendment. As noted above, the deleted Facebook messages are believed to be unrecoverable.

Counsel's failure to notify Vander Pas of the need to disable the autodelete feature, and ostensibly counsel's utter dereliction of their duty to supervise Vander Pas in the discovery collection process, tell a slightly different story. So does the fact that Vander Pas has been able to easily disable the autodelete feature in the past, but opted not to this time around. Where there is no evidence about intent, the Court "may infer bad faith from the circumstances of the destruction of the evidence." *Malibu Media, LLC v. Tashiro*, No. 1:13-CV-00205-WTL, 2015 WL 2371597, at *13 (S.D. Ind. May 18, 2015). It is plausible that Vander Pas and/or her counsel had a motive to retain the autodelete feature. However, the Seventh Circuit has also held that a "competing explanation" or "pre-existing practice," such as a business retention-destruction schedule, may suggest negligence instead. *Id.* at *17; *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998). Moreover, the Board has not exhausted all avenues to obtain the text messages.

But as to counsel's obligation to preserve evidence, equally compelling is the *DR Distributors* analysis, set forth above, about the ubiquity of auto-deletion programs and the necessity to supervise and plan discovery collection with a client. 513 F. Supp. 3d at 931. Unlike Vander Pas, her counsel is familiar with litigation, and their failure to take reasonable steps to preserve discovery is unacceptable. *See* Fed. R. Civ. P. 37(e), advisory committee's notes to 2015 amendment.

After analyzing all of these competing factors, the Court concludes that Vander Pas's and her counsel's conduct as to the text messages, like Vander Pas's conduct as to the Facebook messages, amounts to gross negligence instead of bad faith.

### 2.2 Perjury

"Perjury in the criminal context consists of false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Malibu Media*, 2015 WL 2371597, at *27. When considering the imposition of sanctions for perjury in civil cases, courts consider the criminal context definition and its three elements: (1) false testimony; (2) materiality; and (3) willful intent. *Id.* "False testimony" requires a false statement made "under oath or affirmation" and given "at trial or in an affidavit or deposition." *Id.* (quoting *Zeigler Coal Co. v. Dir., Off. of Workers' Comp. Progs.*, 326 F.3d 894, 901 n.7 (7th Cir. 2003)). "Materiality" requires that the false statement have a "natural tendency to influence" or be "capable of influencing" the decision-maker to whom it is addressed. *Id.* (quoting *Alexander v. Caraustar Indus., Inc.*, 930 F. Supp. 2d 947, 957 (N.D. Ill. 2013)). "The statement must be material at the time it is made, and need not actually affect any resulting decision." *Id.* "Intent" "may be inferred from the circumstances," but "inconsistencies alone do not in every instance support an inference of intent to testify falsely." *Id.* (quoting *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008)).

Vander Pas's and her counsel's creative wordplay as to the difference between traditional journaling and pain journaling aside, Vander Pas's statement at her deposition that she authored her first journal entry on December 16, 2021 was false. The underlying discovery request asked for all journals not just related to Hill or the claims in this case, but also to Vander Pas's damages.

Here, Vander Pas alleges not only emotional and psychological damages, but also physical damages (though not physical damages related

to EDS). Even if the Court were to accept the nuance that a "pain journal" is substantively different from a "traditional journal," the pain journals would still be responsive with respect to damages. Neither Vander Pas nor her counsel have persuasively explained and/or argued that EDS pain and physical pain attributable to Hill's conduct are readily distinguishable. Additionally, Vander Pas testified that the pain journals involved the notation of emotions she associated with her EDS pain. Thus, the pain journals are also clearly relevant with respect to Vander Pas's overall mental health during and after the course of harassment by Hill. As with physical pain, neither Vander Pas nor her counsel have demonstrated that the emotions associated with EDS pain are readily distinguishable from emotions stemming from Hill's harassment, such that EDS pain journal entries, as least as associated with emotions, would obviously be irrelevant.

In the same vein, the Court finds Vander Pas's testimony that she never texted Kachel about the October 2015 events in this case to be false. Vander Pas's Facebook messages clearly demonstrate that she, at one point, had texted Kachel about the facts of this case; the most notable fact in this case—and in Vander Pas's public disclosure—was the October 2015 assault.

These falsehoods were also material. Had the Board accepted either as true, it would have—and in fact, has—lost potentially relevant evidence. Potentially relevant are Vander Pas's physical and emotional state at the time she was pain journaling (which was after the October 2015 assault), as well as her thoughts regarding the same as expressed to one of her closest friends and employer.

The more complicated question is whether Vander Pas made these false statements under oath with willful intent. Willful intent must be distinguished from false testimony given "as a result of confusion, mistake,

or faulty memory." *United States v. Bermea-Boone*, 563 F.3d 621, 627 (7th Cir. 2009) (citation omitted). Unfortunately, the context here compels the Court to conclude that Vander Pas testified falsely with willful intent as to the journals. Vander Pas did not backtrack to clarify the difference between traditional and pain journaling until confronted with the January 2018 blog post. "Common sense and human experience" make it clear to the Court that these efforts at word play were done to conceal the "discrepancy" identified at her deposition. *Alexander*, 930 F. Supp. 2d at 957. So does the language of the January 23, 2018 blog post itself, which explains Vander Pas's enjoyment of journaling generally, without distinguishing pain and traditional journaling. Whether the pre-December 2021 journals contain information Vander Pas sought to conceal or not, it is clear that she sought to cover up the issue afterwards by mincing words and drawing a seemingly self-serving distinction between traditional and pain journaling. This evinces willful intent to conceal information, which her counsel only worsened by later christening the pain journals "pain logs."

Whether Vander Pas testified that she never texted Kachel about the October 2015 incident—which was later proven false, as explained above—with willful intent is a closer call. It is possible that Vander Pas, knowing that her text messages were autodeleted and likely unable to be produced, sought to cover up their relevancy and thus "water down" the prejudice to the Board due to that autodeletion, by saying she never texted Kachel about the October 2015 incident. It is equally plausible, however, that Vander Pas's testimony that she never texted Kachel about the October 2015 incident because she sees him every day was due to a fault of memory. ECF No. 30-1 at 60–61. Absent further evidence, such as the "backtrack"

testimony described above as to the journals, the Court cannot find willful intent as to the testimony regarding texts with Kachel.

### 2.3 Withholding of Discovery and Failure to Investigate

The Federal Rules of Civil Procedure make clear that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Evidence is relevant in a discovery context if it is relevant to the subject matter of the litigation as Rule 26(b)(1) states, not just the particular issues presented in the pleadings." *Eggleston v. Chi. Journeyman Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 903 (7th Cir. 1981).

Although the burden of demonstrating relevance is on the party seeking discovery, once relevance has been shown, it is the objecting party's obligation "to show why a particular discovery request is improper." *Sandoval v. Bridge Terminal Trans., Inc.*, No. 14–CV–639, 2015 WL 3650644, at *1 (E.D. Wis. June 10, 2015). Courts must also keep in mind that it is their duty to "prevent 'fishing expeditions' or an undirected rummaging . . . for evidence of some unknown wrongdoing." *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 531 (2009).

Similarly, "[a] party has a duty to reasonably investigate whether responses to an opposing party's discovery responses are complete." *Malibu Media*, 2015 WL 2371597, at *22. "When a party fails to fulfill" its obligation to "complete a reasonable investigation when presented with the opposing party's interrogatories and document requests," the Court "may use its inherent power to enter appropriate sanctions." *Id.* (quoting *3M Innovative Props. Co. v. Tomar Elecs.*, No. CIV 05-756, 2006 WL 2670038, at *6 (D. Minn. Sept. 18, 2006)).

Regrettably, the instances of withholding of discovery and failure to investigate in this action are copious. The Court has considered Vander Pas's counsel's responses to the Board's alleged discovery violations, and notes that no response was provided as to many of them. For ease, the Court summarizes the violations in the table below.[3]

| **Withholding of Discovery** | **Failure to Investigate** |
|---|---|
| Journals prior to December 2021 still have not been produced. | Despite requests for journals, Vander Pas's counsel's first document production referenced a journal, but no journal was produced until the Board inquired as to the reference. |
| Facebook data other than data from date ranges selected unilaterally by Vander Pas's counsel and never disclosed to the Board still have not been produced. | Facebook message describing relevant text messages from August 2018 was not produced until after Vander Pas's January 2023 deposition. |
| The redactions on the produced Facebook data (none of which predates fall of 2018) have not been explained, and no privilege log has been produced. | Counsel informed the Board it had no further responsive documents regarding social media requests in December 2022, but supplemented with hundreds more pages of social |

---

[3]The Court concurs with Vander Pas's counsel that the city council emails are not in Vander Pas's possession, custody, or control, and that the Board should exercise other means to retrieve them. The Court also agrees that, at this juncture, Vander Pas has satisfied her discovery obligations with respect to the "auto-click" submitted job applications. Given the factual dispute with regard to the timeliness of the Instagram posts from the first Instagram account disclosed, the Court does not include that issue in this table. Finally, the Court believes that the Board shares some of the blame for the untimely medical authorizations. If the Board sought to receive the authorizations prior to the expert disclosure deadline, it should have made its expectations unmistakably clear as to which party was to provide what.

| | |
|---|---|
| | media documents in 2023, including after Vander Pas's January 2023 deposition. |
| The deleted Facebook comments, to the extent recoverable, have not been produced, and there is no indication that any investigation into recoverability is ongoing, as there is with the deleted text messages. | Several previously undisclosed social media accounts were disclosed after Vander Pas's January 2023 deposition. Those accounts contain relevant and responsive ESI. |
| Medical records prior to January 2017 still have not been produced, despite Vander Pas having been diagnosed with EDS in 2016, and the events in this lawsuit dating back to 2012. | Medical record productions were and remain incomplete even after multiple meet-and-confers. |
| Signed medical authorizations only reflect providers seen from Vander Pas's alleged date of mental health diagnoses— October 4, 2018—to the present. Additional authorizations still have not been provided. | Ostensibly no investigation was conducted into producing medical records provided to Vander Pas's retained expert. |
| | The medical records indicate that Vander Pas was receiving mental health treatment prior to the disclosed diagnosis date of October 4, 2018. |
| | The medical records indicate that Vander Pas has received 23 medical diagnoses, while only two were disclosed in discovery. |
| | Job application productions were admittedly inaccurate. |

As the Court has already explained above, journals prior to December 2021 are unquestionably relevant to Vander Pas's damages. Most importantly, the fact that the pain journals required Vander Pas to write down the emotions she was feeling on certain days heightens their relevancy, given that many of the events alleged in the complaint occurred on dates that may be listed in the pain journals following Vander Pas's 2016 EDS diagnosis. For the same reason, medical records prior to January 2017 are also relevant.

The Court is extremely concerned with Vander Pas's counsel and Vander Pas's utter failure to correctly identify the date on which Vander Pas first received mental health treatment. This is not rocket science. It is clear that the identified date of October 4, 2018 is inaccurate, and it is further clear that records of treatment at least back to the first date of harassment by Hill in 2012 are relevant. The Court will not wade into the date cross-references between the interrogatories and document requests, but meet-and-confers and common sense should have revealed to Vander Pas's counsel which records were relevant and which records and dates they had a duty to obtain and/or ascertain with certainty. Indeed, the duty to preserve and retrieve relevant records back to 2012 should have been clear from the moment counsel began drafting the complaint.

Vander Pas's counsel's unilateral narrowing of the dates for the Facebook data collection is also unacceptable. The Court is sympathetic to the costs associated with ESI collection and review, but there are third-party services that can collect social media ESI, *review it*, and prepare it for production for a fraction of the cost. *See, e.g.*, *Relativity*, *available at* https://www.litsupport365.com/relativity-ediscovery-software (last visited Mar. 20, 2023) (explaining $35/GB charge and demonstrating filtering

Page 24 of 32
Case 2:21-cv-01148-JPS    Filed 03/27/23    Page 24 of 32    Document 67

capabilities to review social media data). The Court concurs that a request for all of Vander Pas's social media data from 2012 to the present is overbroad, but the unilateral cuts made by her counsel are inappropriate and indefensibly narrow.

However, in the Court's view, the most serious discovery violations to date are counsel's and Vander Pas's repeated failures to investigate the accuracy and completeness of the discovery responses. Withholding discovery is remediable, as are some instances of spoliation (where documents are still recoverable) and some instances of perjury. Failure to investigate at the outset, however, paints an incomplete and inaccurate picture of litigation that is difficult, if not impossible, to remedy without extending case deadlines—an action this branch of the Court is loath to undertake, particularly where all parties are represented by counsel and aware of their obligations. Failure to reasonably investigate discovery responses destroys all semblance of candor and eviscerates any faith in Vander Pas's counsel as an officer of the Court. It also prejudices the defense, who, with each supplement or change to prior responses—which may be minimal in pieces, but all together is impactful—are forced to scramble to amend their theory of the case. Particularly concerning in this case with respect to prejudice is that investigation into accuracy and completeness was still underway during and after Vander Pas's January 2023 deposition, and even after the February 2023 summary judgment deadline. In fact, it appears to still be ongoing today.

On December 27, 2022, Vander Pas's counsel emailed the Board's counsel regarding the document requests for text messages and social media ESI. ECF No. 32-12 at 1. In that email, counsel represented, as to both categories of requests, that Vander Pas "has no additional responsive

documents to produce at this time." *Id.* Counsel did not mention in that email, or in the December 29, 2022 meet-and-confer that followed, that some texts and social media data had been deleted. The Board avers it did not learn about the deletions until Vander Pas's January 2023 deposition. ECF No. 33 at 22. Vander Pas's counsel's emails are misleading at best.

After the December 29, 2022 meet-and-confer, Vander Pas's counsel represented to the Board's counsel, in pertinent part, that:

> I write to confirm our telephone discussion of earlier today. Much of that conversation related to what you have identified as deficiencies regarding the production of text messages, emails or instant/direct message correspondence and social network account information in Plaintiff's possession or control that contain any reference to the allegations in the lawsuit or the injuries and damages Plaintiff claims to have sustained.

> Contrary to what you may have thought, *no available information responsive to these requests have been withheld.* Plaintiff conducted a search for information responsive to these requests. *All information provided by Plaintiff responsive to these requests has been produced. Plaintiff is not objecting to these requests on relevancy grounds.*

> I agreed to review the methods used by Plaintiff to search for this information and to provide you with an email update no later than Tuesday, January 3, 2023.

ECF No. 32-13 at 1 (emphases added). These assertions were proven untrue time and again throughout the months of January and February 2023. The many instances of counsel's evasiveness, word mincing, and deception lead the Court to conclude that this conduct is indisputably both willful and intentional.

As the *Malibu Media* court held, a client's failure to investigate "is especially egregious in light of her attorney's representations to the

contrary." 2015 WL 2371597, at *23. And, sadly, Vander Pas's counsel's (and her own) failure to investigate is compounded by Vander Pas's perjury as to the journals—and vice versa. *Id.* at *30 ("[E]ven if Kelley did not perjure herself, the events surrounding the XPS 600 merely compound her earlier-described failure to reasonably investigate her responses to Plaintiff's interrogatories."). For example, Vander Pas's counsel's attempt to obscure their failure to investigate by dubbing the pain journals "pain logs" exacerbates Vander Pas's efforts to backtrack and conceal information at her deposition—and vice versa.

Although the signature on discovery responses required by Rule 26 "'does not require the signing attorney to certify the truthfulness of the client's discovery request,' it forces an attorney to 'stop and think' about discovery responses and 'certifies that the lawyer has made a reasonable effort to assure the client has provided all the information and documents available to him that are responsive to the discovery demand.'" *DR Distributors*, 513 F. Supp. 3d at 952 (quoting Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendments). "An attorney must be sanctioned for failing to conduct an objectively reasonable inquiry because of carelessness or inattentiveness; therefore, even honest mistakes can be sanctionable." *Id.* at 953 (internal citations omitted).

Sanctions are particularly warranted where a client's representations turn out to be untrue, but counsel "continue[s] unfazed down the same path" of trust. *Id.* For example, beyond counsel's failure to investigate, Vander Pas did not provide an accurate mental health diagnosis date, and did not provide all of her social media accounts until after her deposition. "Knowingly incomplete and misleading answers to written interrogatories constitutes perjury, as well as [] fraud." *Dotson v. Bravo*, 202 F.R.D. 559, 567

(N.D. Ill. 2001). Therefore, the Court determines that the conduct described in this section is clearly sanctionable.

### 2.4 Magnitude of Sanction

The Court has determined that the spoliation in this case was based on gross negligence rather than bad faith; therefore, it is not sanctionable because, as explained above, a sanction for spoliation requires a showing of bad faith. *Bracey*, 712 F.3d at 1018. However, Vander Pas's perjury, as well as her and her counsel's willful and intentional course of withholding discovery and failing to investigate are sanctionable. Thus, the Court turns to the magnitude and form of an appropriate sanction.

"[A] court has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority may impose appropriate sanctions to penalize and discourage misconduct." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016). A court must find by a preponderance of the evidence that the responsible party acted (or failed to act) "with a degree of culpability that exceeds simple inadvertence or mistake before it may choose dismissal as a sanction for discovery violations." *Id.* at 776, 778. "A district court may dismiss a case as a sanction for discovery abuse if it finds that the party's actions displayed willfulness, bad faith, or fault, and if dismissal would be a proportionate response to the circumstances." *Watkins v. Nielsen*, 405 Fed. App'x 42, 44 (7th Cir. 2010). "Fault, in contrast to willfulness or bad faith, does not require a showing of intent, but presumes that the sanctioned party was guilty of 'extraordinarily poor judgment' or 'gross negligence' rather than mere 'mistake or carelessness.'" *Ramirez*, 845 F.3d at 776 (quoting *Marrocco*, 966 F.2d at 224).

"The Seventh Circuit has cautioned that [the] extreme sanction[] [of dismissal] should only be imposed when there is a clear record of contumacious conduct or less severe sanctions are unavailable." *DR Distributors*, 513 F. Supp. 2d at 983 (citing *Rice v. City of Chicago*, 333 F.3d 780, 785–86 (7th Cir. 2003)). For example, courts have held that where a party "intentionally and willfully provide[s] false and misleading answers on a continual basis during the discovery process, and . . . [s]he has also committed perjury," dismissal with prejudice is the only reasonable sanction. *Dotson*, 202 F.R.D. at 575. Further, "[a]s courts have repeatedly noted," "clients may be held responsible for the acts and omissions of their chosen counsel." *Malibu Media*, 2015 WL 2371597, at *24 (internal citations omitted).

On the facts before it, the Court concludes that the only reasonable sanction is dismissal of this case with prejudice. *See Ramirez*, 845 F.3d at 778–79 (explaining that the magnitude of a sanction of dismissal in a civil case involving money is less serious than dismissal where one's liberty interests are at stake); *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 644 (7th Cir. 2011) (concluding that district court was generous by not ordering sanction of dismissal for failure to investigate discovery responses early on combined with late supplementation in violation of court's orders). Indeed, the *Malibu Media* court held that a party's misrepresentations to the opposing party, withholding of discovery, and deletion of material evidence constituted an "extensive pattern of conduct warrant[ing] the highest of sanctions." 2015 WL 2371597, at *37–38 (collecting cases explaining that draconian sanction of dismissal is appropriate where multiple discovery violations took place).

Vander Pas and her counsel, to date—a month after the summary judgment deadline and approximately one month prior to trial—still have not fully satisfied their discovery obligations. Vander Pas's counsel informed the Board in December 2022 that discovery was complete and explicitly stated that they lodged no relevance objections; nonetheless, counsel presents relevance objections to the Court in response to the Board's motion. While the Court thoroughly considered those arguments, it nonetheless agrees with the Board that Vander Pas's counsel waived those arguments when they failed to raise them in response to the discovery requests. *See, e.g.*, *Cox v. Sherman Capital LLC*, No. 12-CV-1654, 2014 WL 712659, at *3 (S.D. Ind. Feb. 24, 20140 (holding that "[f]ailure to raise an objection to a Rule 34 request for production" in the "initial response" to discovery requests "constitutes waiver of the objection"). Moreover, the record reveals that discovery continued to be supplemented through January and February 2023.

While the allegations in this case are serious, and Vander Pas's damages claims are high, counsel and Vander Pas did not put the requisite time and effort into aggressively preserving discovery. While the discovery process may be both burdensome and costly, the same holds true for litigation. In this instance, dismissal with prejudice is proportionate to the magnitude of the violations. Vander Pas herself is less at fault than her counsel. But, by way of example, it is apparent that Vander Pas did not provide completely accurate responses to many discovery requests, and tried to backtrack and evade questions at her deposition relating to the same. Her counsel's reliance on semantics and additional backtracking compounded that issue. At any rate, the overarching problems and the Court's most serious concerns relate to Vander Pas's counsel's sweeping

pattern of deception, which evinces a willful and intentional mindset. The Seventh Circuit could not be more clear that counsel's discovery violations are attributed to the client.

The Court is sympathetic to the gross discrepancy between culpability—Vander Pas's counsel is indeed to blame for the majority of these violations—but Vander Pas's and her counsel's evasion together has caused the Board and the Court to expend extensive time, energy, and resources. Our judicial system is built on candor and, most importantly, on justice. There is no room for obfuscation. A less serious sanction would not adequately promote and protect these interests given the countervailing course of misconduct here. *See Long v. Steepro*, 213 F.3d 983, 986–88 (7th Cir. 2000) (explaining necessity of proportionality where dismissal is imposed, and citing cases where pattern of behavior was deemed proportionate to dismissal, as opposed to single missed deadline in case at bar). In addition to dismissal with prejudice, Vander Pas's counsel—not Vander Pas herself—must pay the Board's reasonable costs and expenses for filing the instant motion to compel and for sanctions. *See* Fed. R. Civ. P. 34(a)(5)(A).

**3.      CONCLUSION**

For the reasons set forth above, the Court grants the Board's motion to compel and for sanctions, ECF No. 31. Because the Court will enter the sanction of dismissal with prejudice, the Court denies as moot the Board's motion to stay, ECF No. 31, and the Board's motion to amend its answer, ECF No. 36.

Accordingly,

**IT IS ORDERED** that Defendant Board of Regents of the University of Wisconsin System's motion to compel and for sanctions, ECF No. 31, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Stephanie Goettl Vander Pas's counsel shall pay Defendant Board of Regents of the University of Wisconsin System's reasonable costs and fees for filing the motion to compel and for sanctions, ECF No. 31;

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that Defendant Board of Regents of the University of Wisconsin System's motion to stay, ECF No. 31, and motion to amend its answer, ECF No. 36, be and the same are hereby **DENIED as moot**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2023.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge